LA SALLE NATIONAL BANK, as Trustee, *et al.*, Plaintiffs-Appellees, v. 53RD-ELLIS CURRENCY EXCHANGE, INC., *et al.*, Defendants-Appellants.

First District (5th Division)   No. 1—91—0636

Opinion filed June 30, 1993.—Rehearing denied August 10, 1993.

James P. Nally and Robert E. Colan, both of Chicago, for appellants.

Daniel S. Hefter & Associates, of Chicago (Daniel S. Hefter, John R. Heine, and Richard A. Mertz, of counsel), for appellees.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Plaintiffs brought suit seeking a declaratory judgment to their rights under a five-year lease, possession of the premises, and rescission of a 20-year lease for the same property. After a bench trial, the trial court found that the 20-year lease in question was invalid as it

was the product of undue influence and that even if no undue influence was present, the 20-year lease had been effectively rescinded. On appeal, defendants challenge these findings. Defendants also contend that the trial court erred in considering for impeachment purposes numerous alterations to a witness' deposition and abused its discretion in refusing to permit them to amend their pleadings to add an equitable estoppel defense. Finally, defendants contend that the plaintiffs should be denied recovery under the doctrine of unclean hands and because they have waived their right to challenge the 20-year lease by accepting rent payments under it. For the reasons set forth below, we affirm the decision of the trial court.

FACTS

This suit involves a dispute between two siblings, Sharon Wasserberg and Sidney Miller, which arose out of actions taken by their terminally ill father, Joseph Miller (hereinafter Joseph). Joseph owned, operated and was sole shareholder of the 53rd-Ellis Currency Exchange, Inc. (hereinafter currency exchange), which was organized as a corporation. The currency exchange was located in a building at 5305-9 South Ellis Avenue and 1001-1013⅓ East 53rd Street which was "owned" by Joseph. The ownership to the building was held in a land trust by the La Salle National Bank (hereinafter bank) as trustee. The trust agreement specifically provided that the trustee "will deal with said real estate only when authorized to do so in writing *** on the written direction of Joseph Miller."

At various times during 1986, Joseph executed three leases for the currency exchange: (1) a five-year lease running from May 1, 1986, to April 31, 1991, which was executed in May 1986; (2) a 20-year lease executed in October 1986 which ran from November 1, 1986, through April 31, 1991, with an option to the lessee; and (3) a one-year lease executed in November 1986 which ran from November 1986 through November 1987. The issue before us with respect to these leases is whether the 20-year lease was validly executed and, if so, whether it was subsequently rescinded.

Pursuant to Joseph's will, after his death in December 1986, Sharon received ownership of the building and Sidney of the currency exchange. Subsequently, in April of 1988, plaintiffs brought suit seeking declaratory judgment as to their rights under the five-year lease, possession of the premises, and rescission of the 20-year lease. A bench trial was held at which the following testimony was heard.

Michael Wasserberg (hereinafter Michael), Sharon's husband, testified that he had been property manager of the 53rd-Ellis building

since 1985. He said that the building had 43 apartments and 9 store fronts, one of which was occupied by the currency exchange. In April 1985, Joseph directed him to execute a lease for the currency exchange with a term beginning May 1, 1985, through April 30, 1986, at a rental rate of $650 per month. Michael prepared the one-year lease which he testified was their "standard practice" at the time.

Michael stated that in April 1986 Joseph said that he was thinking about giving the currency exchange to his son, Sidney, and the building to his daughter, Sharon, after he passed away. In May 1986, Joseph was hospitalized with terminal cancer and in June he was moved to a nursing home where he stayed until August 1986. In August, he returned to his personal residence and lived there until his death in December 1986.

Michael said that Joseph had been bedridden since May 1986 and that he never regained full use of his limbs. In June 1986, Joseph consulted Michael as to what he thought would be a fair long-term lease for the currency exchange and was advised by Michael to make it five years. A short time thereafter, Joseph directed him to prepare a five-year lease with the usual rider for a term from May 1986 through April 1991 starting at $700 a month and increasing in $25 increments every year. Michael testified that he executed the lease on behalf of the building and Joseph executed it on behalf of the currency exchange.

Michael stated that he and Sharon received a phone call on November 7, 1986, from Joseph, who sounded distraught, repeatedly stating that he had done "something awful." He then told them that Sidney had been constantly pressuring him and that as a result he had signed a 20-year lease for the currency exchange. Joseph said that Sidney brought the lease for him to sign and then went to register it with the trust.

Michael said that he and Sharon then placed a conference call to George Heisler, who had been Joseph's attorney since 1974. Joseph related that he had been pressured by Sidney to execute the 20-year lease and asked Heisler to correct the matter by executing a one-year lease. Joseph stated that he wanted the one-year lease because Sidney had been jeopardizing the status of the building and was acting like a "bastard."

Michael recounted that Heisler felt it was not his place to draft any additional documents because he had not prepared the 20-year lease. Heisler suggested that they call the attorney who had prepared that lease, Irving Slutzky. Michael testified that he placed a conference call with Slutzky and Joseph at which time Joseph expressed

that he had made a mistake in executing the 20-year lease and wanted to execute a one-year lease in its place. According to Michael, that same afternoon, at Joseph's direction, he went to Slutzky's office and picked up the one-year lease and brought it to Joseph at his home where he read, signed and affixed the corporate seal to the lease.

According to Michael, it was at this time that Joseph again detailed the pressure he had received from Sidney. Joseph told him that Sidney would call or visit every morning and would then call six or seven times during the day about the term of the lease. Joseph then told Michael to have the one-year lease lodged with the bank, but Michael did not do so.

Michael then described a meeting which he, Sharon, Sidney, and Heisler all attended on November 12, 1986, at Joseph's residence. After Heisler left, they discussed the lease at which time Joseph told Sidney that he did not have a lease. Two weeks after that meeting, Joseph told Michael that he had his nurse, Ethel Tripp, carry a document to the bank rescinding the 20-year lease.

Ethel Tripp testified that she was a certified nurse's aide who took care of Joseph at his residence from August 1986 until Joseph's death in December of that year. She stated that on November 13, 1986, Joseph asked her to take a sealed manilla envelope to Mrs. Welter at the La Salle National Bank and she did so. After she returned, Joseph received a phone call from the bank and then sent her back to the bank with an unsealed envelope. Tripp stated that Joseph was "acting really funny." She looked inside of this envelope and saw, among other things, a small paper about the currency exchange which she identified at trial as a handwritten letter of direction ordering the trustee to cancel the lease. She then took the envelope to the bank and gave it to the same lady.

Rita Welter, an assistant secretary and real estate officer of the bank during 1986, identified a letter of direction that she received on November 13, 1986, which directed the bank to execute a lease and to cancel the five copies of the lease that had been executed by the trustee. She stated that she told the person bringing in these documents (Ethel Tripp) that the land trust does not cancel leases and that the beneficiary must do that. Welter explained to the bearer that the unsigned documents could be left in the file for safekeeping, but to make it clear on the record the beneficiary should do something in writing. Welter testified that the documents were then turned back to the person who delivered them. They were subsequently returned to the bank with a handwritten letter from Joseph. These documents were then lodged in the trust file.

Joseph Lang, the head of the land trust department at the bank, testified that the trustee need not form an intent to cancel a lease if the beneficiary of the land trust notifies the land trust of its intention to cancel a lease, even where the lease has been executed by the trustee. He stated that a lease is cancelled by a termination agreement between the parties and the trust is not involved. He continued, "the trustee really does not make any decision. It is a mechanical movement, so to say. We get a direction to execute a document, we execute a document when directed. The trust beneficiary subsequently says that document as it is executed is null and void, per my direction. To us that terminates it. There is no further intent or anything on behalf of or by the trustee."

Irving Slutzky, an attorney who had represented Joseph intermittently since 1981, testified that in October and November 1986 he had several meetings with Sidney concerning a 20-year lease which he prepared on October 31, 1986, pursuant to instructions from Sidney and Joseph. Slutzky said that when he spoke to Joseph about the lease, Joseph appeared upset. He testified that he spoke with Joseph on the phone four times on November 6, 1986, and was asked by him to prepare a one-year lease because of the problems between Sharon and Sidney. He subsequently prepared a five-year lease pursuant to Joseph's instructions of November 10, 1986. Slutzky identified a letter he prepared directing the bank to execute certain documents and stated that Joseph told him to include language cancelling the five copies of the 20-year lease at a fixed rate ($800 per year).

George Heisler testified that on July 8, 1986, Joseph asked him to prepare a five-year lease for the currency exchange and on September 3, 1986, they spoke about a 20-year lease. Heisler stated that he prepared a 15-year extension to the five-year lease in September of 1986. He stated that on November 7, 1986, he had a discussion with Sharon, Joseph, and Michael at which time Joseph told him that Slutzky had prepared a one-year lease. On November 10, 1986, Heisler spoke with Joseph about a one-year lease with four option years. Heisler testified that it was his impression that Sidney had been pressuring Joseph for a long-term lease.

Plaintiffs then called Sidney as an adverse witness. He stated that after learning of his father's plan to leave him the currency exchange and his sister the building, he told his father that he wanted a long-term lease. Sidney said that his father offered him a 40-year lease on July 2 with a fixed rental rate and that they had briefly spoken of the lease in May 1986 when Joseph was in the hospital.

Sidney stayed with his father after Joseph returned home from the nursing home in August 1986. Sidney testified that he would care for his father, giving him medication according to his instruction. At this time, Joseph was bedridden and upset. Sidney admitted that he wrote most of Joseph's checks for him and kept the checkbook registry.

Sidney confirmed that he contacted Slutzky about drafting a new lease on October 27, 1986, and that they met twice to construct the new lease. He testified that he reviewed the draft of the 20-year lease which he received from Slutzky along with a corporate resolution and a letter of direction on October 31, 1986, and then took the documents to Joseph for his signature. On November 4, 1986, he took these documents to be lodged with the bank's trust. Sidney admitted that he told his father it would be a good idea if the currency exchange and building were owned by the same person.

Sharon Wasserberg testified that she first spoke to her father about the lease in November 1986. She related that after the November 7, 1986, phone conversation with her father, she called Heisler and told him that Joseph was being emotionally abused by Sidney. During the call to Heisler, Joseph stated that he wanted to cancel the 20-year lease and execute a one-year lease because he was concerned about Sidney's behavior as a tenant. She said that at the November 12, 1986, meeting, Joseph told Sidney that he did not have a lease.

Sharon identified a note to the bank as being in her father's handwriting. This note instructed the bank to cancel the leases. She also identified the writing on the five copies of the 20-year leases marking them "void" as that of her father.

Tessie Fry, a tenant in the building, testified for the defense that she spoke with Joseph about a rent increase and that he said that he could not help her because Michael threatened not to let him see his grandchildren if he interfered.

Bob Malowsky, a family friend, testified that he and Joseph had several discussions during 1986 at which time Joseph told him about the "problems" between his children. He related that Joseph spoke of selling everything and just dividing up the proceeds equally between his children and that Sidney had acquiesced in that proposal. Malowsky testified that after this conversation, Sharon told him that her father was not in his right mind if he was going to sell the building.

Ethel Tripp was recalled by the defense as an adverse witness under section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1102). She testified that she saw Joseph and Sidney together on several occasions and that she never saw Joseph

upset with Sidney. She related that Sharon and Sidney did not get along and that Joseph had told her that several times. She had seen Joseph become upset once or twice after speaking with Sharon, but did not know what the topic of conversation was. She said that Joseph cared about both his children and was upset about the fighting between them. On cross-examination, she testified that she heard Sharon and Joseph talking about a lease on several occasions and that she did not hear any conversations between Joseph and Sidney about it.

Maxine Johnson testified that she worked for Joseph as a nurse's assistant a couple of days per week for about 2½ months during 1986. She stated that Sharon visited Joseph twice while she was present and that during one of these visits, Sharon was "very upset" and argued with Joseph for a couple of hours.

Dr. Holstein, Joseph's physician, testified that in 1986 Joseph was terminally ill with prostate cancer. Holstein stated that during 1986 Joseph told him that he wanted to provide for his children equally, but he was "afraid" that Sidney would take over Sharon's part. Holstein said that Sidney "would never have influence over Joseph" because the more Sidney pushed, the more likely Joseph was to rebel against the idea.

Sidney Miller then testified in defendants' case in chief that his father became unable to handle his day-to-day affairs of the currency exchange after he was hospitalized in May 1986. He said that he agreed to his father's estate plan; Sharon would own the building, he would own the currency exchange. Sidney stated that he wanted a long-term lease and an agreement that the building would not be sold during the term of the lease so that he would not have to deal with a hostile landlord. This division of property was confirmed in a discussion in April 1986 wherein his father stated that a long-term lease was to be part of the settlement.

On July 2, 1986, he had a discussion with his father and Heisler at which time his father offered him a 40-year lease. On July 20, 1986, Sidney met with Joseph at the nursing home and his father told him that there was currently a five-year lease in place and that he intended to extend it to 25 years. In early August 1986, his father agreed that a long-term lease was necessary, and in early September, he was asked to come to the apartment to witness the signing of a 15-year lease rider.

Sidney further testified that he stayed with his father during the entire month of August 1986 and that after that private duty nurses were hired to take care of him. Sidney related that he met with

Slutzky about the lease on September 23, 1986, and then met with his father a few days later to discuss the situation and that Joseph instructed him to have a new lease prepared. Joseph asked him to prepare a 20-year lease on October 27, 1986. He picked up that lease from Slutzky on October 31, 1986. Sidney stated that he took the lease and the letter of transmittal to his father that afternoon for him to sign.

Sidney testified that he assumed full management responsibility for the currency exchange in May 1986 and spent his day taking care of his father's business and running errands for him. According to Sidney, in May 1986, the currency exchange had three directors, his father, himself and Sharon. He testified that the board of directors never met to cancel the 20-year lease and that he did not receive any formal notification of its purported rescission even though he was then acting president and general manager of the currency exchange. Sidney urged that without a lease the currency exchange would have no license and would be worthless and that if the currency exchange had to move it would suffer heavy losses because location is very important in that industry.

He stated that his father reiterated on November 17, 1986, and on November 20, 1986, that Sharon had been pressuring him about the lease, but that he wanted to keep the 20-year lease. Joseph told him that the bank had sent him some papers, but that he was not going to sign them because signing them would cancel the lease. Sidney stated that after the November 12 meeting, Joseph sent all the excess copies of the 20-year lease to the bank because he did not want Michael or Sharon to get a hold of them. Sidney said his father reaffirmed his intent to stick with a 20-year lease in a conversation which they had shortly thereafter.

During Sidney's testimony, his attorney attempted to elicit facts to support an equitable estoppel theory to which an objection was sustained. Defendant subsequently made an offer of proof that Joseph promised Sidney a 40-year lease at a fixed rate and all the stock in the business if he came to work full-time at the currency exchange. In reliance on that offer, Sidney stated that he gave up his job as a water chemical salesman making $45,000 a year and began working full-time as the general manager of the currency exchange. The trial court denied defendants leave to amend their pleadings to add the defense of equitable estoppel.

During the course of Sidney's testimony as an adverse witness, plaintiffs impeached him three times from an uncorrected version of a transcript of a deposition which Sidney had given in October 1988.

Sidney was also impeached twice with this transcript on cross-examination when he testified in defendants' case in chief. Defense counsel objected to the use of the uncorrected deposition transcript because Sidney had made "extensive corrections" to the deposition pursuant to Illinois Supreme Court Rule 207. (134 Ill. 2d R. 207.) He contended that the original transcript could not be used as impeachment because his official deposition was the one with the changes. The trial court permitted plaintiffs to impeach Sidney with the original responses he gave at the deposition, but permitted the alterations to be reflected where they occurred. When asked during this impeachment whether he made each of the five statements shown in the uncorrected transcript, he answered, "Yes." Plaintiff subsequently offered the 15 pages of corrections Sidney made to his deposition into evidence without objection to its admission.

Throughout Sidney's testimony as an adverse witness under section 2—1102 and in defendants' case in chief, the trial court sustained objections to Sidney's frequent attempts to volunteer unelicited testimony without regard to the limitations of the question put before him and to testify in narrative form. The trial court admonished him seven times to listen carefully and only answer the question pending. In one instance, the trial court told Sidney, "Sir, listen carefully. Does it hurt so much to be candid in this case? *** All that we want here, sir is the truth." The court then stated that Sidney was such an "extraordinary witness" to warrant a side bar concerning his testimony and during that sidebar described Sidney as "one of the most evasive equivocal witness that I have ever seen" with "a grudging disinclination to admit even stuff that would not hurt him."

On cross-examination, Sidney admitted that he and Slutzky worked together to draft the 20-year lease and that he never contacted his sister about the lease because their "father at the time was the landlord." He stated that during the November 12, 1986, meeting his father may have mumbled something that sounded like "the 20-year lease is destroyed," but he was not sure.

William Dillon, a real estate officer at the bank, testified that documents to be lodged with the trust are sent to the trust accompanied by a letter of direction signed by the beneficiary of the land trust. If a document is not signed, the land trustee will return the documents to the beneficiary by giving them to the person who brought them in or by mail. Dillon explained that the land trustee does not cancel leases or write across documents and that the rescission or voiding of a document is "totally up to the beneficiary of the land trust." Dillon said if a beneficiary sends in a document with "void" marked on it and the

beneficiary instructs that the document be placed in the trust file, the trustee will do so. Dillon testified that the trustee merely acts according to directions and that the trustee does not require substitution of a lease if one is cancelled. He stated it was not up to the land trustee to "change leases or make it null and void or make any alterations."

In its decision, the trial court found that the 20-year lease was invalid as it was the product of undue influence on Sidney's part. In the alternative, the trial court held that even if undue influence was not present, Joseph's letter of direction to the trust had effectively rescinded the 20-year lease. In making this determination, the trial court commented extensively on Sidney's lack of credibility as a witness, noting both his trial testimony and demeanor. In addition, the trial court also noted the numerous changes Sidney made to his deposition pursuant to Supreme Court Rule 207.

OPINION

On appeal, defendants contend that the trial court erred in finding the purported 20-year lease to be invalid. In support, defendants first argue that the 20-year lease was not the product of undue influence because there was no fiduciary relationship between Sidney and Joseph. Defendants next challenge the trial court's holding in the alternative that Joseph rescinded the 20-year lease by sending a handwritten letter of direction to the trustee ordering the cancellation of the lease. Defendants further argue that the trial court erred in permitting use of the uncorrected deposition transcript to impeach Sidney with prior inconsistent statements notwithstanding that his answers were subsequently changed and revised under Rule 207. Defendants also contend that it was error to consider the voluminous number of corrections which Sidney made to the deposition transcript in assessing Sidney's credibility without having heard evidence to establish the accuracy of the original transcript. In addition, defendants assert that the trial court abused its discretion in not allowing them to amend their pleadings in the middle of trial to add an equitable estoppel defense. Finally, defendants contend that the plaintiffs should be denied recovery under the doctrine of unclean hands and because they have waived their right to challenge the lease by accepting rent payments under the 20-year lease.

■ We will first address defendants' contention that there was no fiduciary relationship present between Sidney and Joseph to support its findings of undue influence. A fiduciary relationship can arise in one of two ways: "(a) from the relationship of the parties, such as an attorney-client relationship; or (b) from the facts of a particular situa-

tion, for example, where one reposes trust in another with resulting superiority and influence in the other." (*In re Estate of Henke* (1990), 203 Ill. App. 3d 975, 981, 561 N.E.2d 314.) A fiduciary relationship is not present *per se* between a parent and child. (*Pepe v. Caputo* (1951), 408 Ill. 321, 97 N.E.2d 260.) Rather, a number of factors should be examined to determine whether a fiduciary relationship exists, including: "degree of kinship, disparity in age, health, mental condition, and education, and the extent to which a servient party entrusted the handling of her business affairs to a dominant party and reposed faith and confidence in her." (*In re Estate of Henke*, 203 Ill. App. 3d at 981.) A court of equity "will not set any bounds to the facts and circumstances out of which a fiduciary relationship may spring." (*Staufenbiel v. Staufenbiel* (1944), 388 Ill. 511, 522, 58 N.E.2d 569.) The trial court's determination that a fiduciary relationship existed and that undue influence was present will not be overturned unless it is against the manifest weight of the evidence. *In re Estate of Henke*, 203 Ill. App. 3d at 984.

There is sufficient evidence in the record to support the trial court's determination that a fiduciary relationship existed between Sidney and Joseph. The record reflects that commencing in August following his return from the hospital, Joseph had grown weaker and was bedridden as a result of a terminal illness. (See *Davis v. Brickey* (1947), 397 Ill. 556, 74 N.E.2d 710.) Thus, when the 20-year lease was executed in October of 1986, Joseph's health had grossly deteriorated. According to Sidney's own deposition testimony, his father was depressed and needed medication which Sidney sometimes gave him. Also, Sidney admitted that upon his father's return from the hospital in August, he would care for his father's personal finances and wrote most of his father's personal checks on his behalf. They would frequently spend time alone together. There was also considerable testimony in the record from a number of witnesses who stated that throughout this period Sidney repeatedly called on the phone and visited his father in person to talk about the lease.

Moreover, Sidney assumed everyday control over his father's currency exchange business, although Joseph did not relinquish total control over some of his financial matters. (See *In re Estate of Mooney* (1983), 117 Ill. App. 3d 993, 453 N.E.2d 1158 (evidence sufficient to support a finding of undue influence where benefited party shared a dominant relationship and handled the financial affairs of the influenced party).) In so doing, we note that Sidney brought in attorney Slutzky to draft the 20-year lease even though others had prepared the earlier leases. Sidney also participated in the drafting of the 20-

year lease outside the presence of Joseph or other relatives. (See *In re Estate of Henke*, 203 Ill. App. 3d at 979 (determining that trial court's finding that will was the product of undue influence was not against the manifest weight of the evidence when benefited party took testator to a different attorney's office to draft a new will under which she greatly benefited).) We therefore conclude that the trial court's determination that a fiduciary relationship existed was not against the manifest weight of the evidence.

■ Defendants also argue that the trial court's finding of undue influence was incorrect since under the terms of the lease Sidney did not receive any undue or inequitable benefit from the lease. Defendants argue that a 20-year lease at a fixed rate was not unreasonable in light of Joseph's expressed intent for an equitable disposition and the fact that he previously considered giving Sidney a 40-year lease and Sharon had income from the other tenants in the building to support her.

This argument is also unavailing. While Joseph's intent was to provide for his children on an equal basis, *i.e.*, giving Sharon the building and Sidney the currency exchange, the evidence supports the conclusion that an extended-term lease was not necessary to preserve such parity in the testamentary distribution. The evidence showed that it was the building's past practice to give one-year leases, albeit that the length of the lease was not crucial when both entities were under the same ownership. However, the evidence also showed that the industry standard was to give five-year leases. The trial court expressly found that Joseph was aware that the currency exchange could be sold quickly for a significant amount with only a five-year lease. The trial court also found that no offer of a 40-year lease was proven, stating that it was not Joseph's intention to saddle the building with a "commercially absurd" lease which reduced its marketability and overall value. Accordingly, we determine that the trial court's finding that the 20-year lease was the product of undue influence was not against the manifest weight of the evidence. (See *In re Estate of Henke*, 203 Ill. App. 3d at 984.) There the trial court found a will to be the product of undue influence where the beneficiary of the new will lived with the testator, had considerable influence over the testator, had the testator's trust and confidence, and drove the testator to a lawyer to have the will changed. The appellate court upheld the trial court's determination even though defendant presented evidence that the testator had managed her own business affairs until the time of her death, paid her own bills, was neither mentally nor physically in-

firm, and was characterized by one witness as a strong-willed individual who knew exactly what she wanted.

We also agree that the record supports the conclusion of the trial court that even if undue influence was not present in the execution of the lease, Joseph effectively rescinded the 20-year lease by sending a handwritten letter of direction ordering the cancellation of the lease. In arguing that Joseph's actions were legally ineffective to rescind the 20-year lease, defendants contend that the parties to the 20-year lease were the bank as trustee and the currency exchange and that as neither the trustee nor the currency exchange's board of directors participated in the lease's rescission, the lease remained in operation. This argument, however, ignores the fact that although three separate legal entitles are present in this case, Joseph, the currency exchange, and the bank as trustee, all were under Joseph's sole direction and control. This being the case, we conclude for the following reasons that Joseph had the power to revoke the lease in question without approval or ratification from the trust or the corporation's board of directors.

With respect to the land trust's role in the rescission process, defendants contend that it was necessary for the land trustee to sign or in some way be part of the rescission as it was legal title holder to the property and had signed the 20-year lease as landlord. Plaintiffs urge that the land trustee did not need to play an active role in the rescission in light of the considerable testimony that the land trustee was bound to do what the beneficiary, Joseph, instructed it to do and Joseph's handwritten letter of direction ordering the cancellation of the 20-year lease.

■ A "land trust agreement vests title, both legal and equitable, to the real property in the trustee while the interest of the beneficiary of the trust is personal property." (*First National Bank v. Oldenburg* (1981), 101 Ill. App. 3d 283, 286-87, 427 N.E.2d 1312; *In v. Cheng* (1991), 232 Ill. App. 3d 165, 596 N.E.2d 1151.) In spite of its classification as a personal property interest, "most of the usual attributes of real property ownership are retained by the beneficiary under the trust agreement." *Azar v. Old Willow Falls Condominium Association* (1992), 228 Ill. App. 3d 753, 756, 593 N.E.2d 583.

The "owner of a beneficial interest in a land trust is accorded four basic powers: (1) to possess, manage and physically control the real estate; (2) to receive all income generated by the property; (3) to direct the trustee in dealing with title to the real estate; and (4) to receive the proceeds of any sale of the property made pursuant to the power of direction." (*Patrick v. Village Management* (1984), 129 Ill.

App. 3d 936, 939, 473. N.E.2d 493.) Unlike a conventional trust, " 'the Illinois land trust gives the beneficiary full and complete control over the management, use, and disposition of the property, just as if he had legal title.' " *Parkway Bank & Trust Co. v. Gleich* (1991), 213 Ill. App. 3d 444, 449, 572 N.E.2d 1055, quoting Haswell & Levine, *The Illinois Land Trust: A Fictional Best Seller*, 33 De Paul L. Rev. 277, 278 (1984).

■ Courts have been cognizant of the interplay and tension between the land trust's status as an independent legal entity and the status of the sole beneficiary who has the power to direct and dictate the actions of the trust. (See *Parkway Bank & Trust Co.*, 213 Ill. App. 3d at 449; see also *Azar*, 228 Ill. App. 3d at 756.) Recognizing both the passive nature of a land trust and the power given a sole beneficiary under a land trust agreement, courts have allowed such beneficiaries to enter into a binding contract for the sale of the land and to bring actions to determine their rights with respect to the management and control of the land. (See *Parkway Bank & Trust Co.*, 213 Ill. App. 3d at 449; *Jacobs v. Carroll* (1977), 46 Ill. App. 3d 74, 360 N.E.2d 136; *House of Realty, Inc. v. Ziff* (1972), 9 Ill. App. 3d 419, 292 N.E.2d 71; see also *Paine/Wetzel Associates, Inc. v. Gitles*, (1988), 174 Ill. App. 3d 389, 528 N.E.2d 358; *Giannini v. First National Bank* (1985), 136 Ill. App. 3d 971, 483 N.E.2d 924; *Emerich v. Leviton* (1983), 117 Ill. App. 3d 832, 454 N.E.2d 45; *Oldenburg*, 101 Ill. App. 3d at 289-90.) In the context of enforcing a sales contract entered into by the beneficiary of a land trust where the land trust agreement permitted the beneficiary control of the selling, the court in *Madigan v. Buehr* (1970), 125 Ill. App. 2d 8, 17, 260 N.E.2d 431, stated:

> "To permit the beneficiary to contract in this manner does not encroach upon the jurisdiction of the trustee nor its functions; it does not infringe upon the protection afforded a purchaser who deals with the trustee, nor does it expand the beneficiary's liability or change his status. His legal interest in the trust remains personal property; but allowing him to climax negotiations for the sale of the real estate by agreeing to have it conveyed removes some of the make-believe which hovers over land trusts and permits a realistic approach to the disposition of trust property."

See also *Seaberg v. American National Bank & Trust Co.* (1976), 35 Ill. App. 3d 1065, 342 N.E.2d 751 (beneficiary of a land trust may enter into a valid contract to convey title to the trust property).

On point is *La Salle National Bank v. Khan* (1989), 191 Ill. App. 3d 41, 547 N.E.2d 472. In *Khan*, defendant tenants contended that notice from the sole beneficiary of a land trust did not satisfy a lease provision which required that notice of an intent to declare forfeiture be given after a breach of the lease occurred. The *Khan* defendants argued that only the land trustee had the power to give such notice because it had signed the lease as the landlord.

This court rejected that argument stating that the sole beneficiary of the land trust had the authority to enforce the terms of the lease. In making its determination, the *Khan* court looked to the rider of the lease which contained language expressly detailing the trust's complete lack of involvement in managing the property and to the fact that the rent payments were paid directly to the beneficiary.

Besides the fact that the rent here, as in *Khan*, was paid to Joseph directly and not to the land trustee, the 20-year lease contained the same language present in *Khan*. It provided:

"It is further understood and agreed that said Trustee has no agents or employees and merely holds naked legal title to the property herein described; that said Trustee has no control over, and under this Lease, assumed no responsibility for (1) the management or control of such property, (2) the upkeep, inspection, maintenance or repair of such property, (3) the collection of rents or rental of such property, or (4) the conduct of any business which is carried on upon such premises."

■ Accordingly, in view of the trustee's admittedly completely passive role in the management of the property as evidenced by the terms of the lease as well as the trust agreement, we conclude that Joseph had the authority to rescind the lease without any further participation on the part of the trustee. (See *Southeast Village Associates v. Health Management Associates, Inc.* (1981), 92 Ill. App. 3d 810, 416 N.E.2d 325; *Klein v. Ickovitz* (1970), 121 Ill. App. 2d 191, 257 N.E.2d 187.) In these cases, the appellate court recognized that the beneficiary of a land trust may enter into a lease in its own name where the trust agreement provides that such beneficiary has the right of management, control, and renting of the property. See also *Bellows v. Ziv* (1962), 38 Ill. App. 2d 342, 187 N.E.2d 265 (land trust beneficiaries entitled to maintain an action against holdover tenant for rent in their own name even though title vested in trustee's name).

In a similar vein, defendants claim that Joseph's independent, handwritten rescission fails to effectuate a valid rescission of the lease on behalf of the corporation where he did not first consult with the board of directors, *i.e.*, Sidney and Sharon. We disagree.

In this case, Joseph was the president of the currency exchange and its sole operator. As such, he was empowered to enter into and rescind contracts on behalf of the corporation during the ordinary course of business. (*Green v. Ashland Sixty-Third State Bank* (1931), 346 Ill. 174, 178 N.E. 468; *Golen v. Chamberlain Manufacturing Corp.* (1985), 139 Ill. App. 3d 53, 487 N.E.2d 121.) Contrary to defendants' contention otherwise, based on *Hadley v. Union Trust & Savings Bank* (1922), 226 Ill. App. 170, approval of a contract by the board of directors is only necessary when the contract in question is "unusual or extraordinary." (*Golen,* 139 Ill. App. 3d at 59.) In this instance, we cannot say that entering into or rescinding a lease for office space is so unusual or so extraordinary as to mandate prior approval from the corporation's board of directors. Consequently, we conclude that Joseph had the authority to rescind the lease by virtue of his being president of the corporation. See *Golen,* 139 Ill. App. 3d at 59.

Moreover, in addition to being its president, Joseph owned 100% of the stock of the currency exchange and did so until his death. In light of Joseph's complete ownership and control of the corporation, there was no need for him to gain approval from Sharon and Sidney prior to rescinding the lease. As the court stated in *Mid-Continent Construction Co. v. Goldberg* (1963), 40 Ill. App. 2d 251, 261, 188 N.E.2d 511, quoting Fuller, *The Incorporated Individual: A Study of the One-Man Co.,* 51 Harv. L. Rev. 1373, 1388 (1938):

> " 'It has been urged that a shareholder-manager may not contract in the corporate name in the absence of authority from the board of directors. But if the one-man company is viewed realistically, it affords no proper place for the application of general agency principles to the activities of the shareholder-manager. Where a sole shareholder purports to act in behalf of the company, there is no other person concerned; he acts in his own interest and for himself alone. The justification existing in the ordinary corporate situation for treating the corporation as a separate person, i.e., a principal, is entirely lacking.' "

(See also *Clemens v. Sandee Manufacturing Co.* (1969), 114 Ill. App. 2d 322, 252 N.E.2d 897 (president of corporation who was also its sole shareholder had the power to create oral trust for benefit of employee's wife from proceeds of insurance policy owned by the corporation); *Korman v. Wanen Catalpa Apartments, Inc.* (1959), 20 Ill. App. 2d 598, 156 N.E.2d 621 (shareholder who owned 244 of 250 shares, with his wife and daughter owning other six shares, could enter binding contract to sell sole corporate asset without consulting officers

and directors).) As such, we conclude that Joseph had the authority to rescind the lease on behalf of the currency exchange without prior approval from the board of directors.

Defendants contend that even if Joseph had the authority to rescind the lease by acting independently, there was insufficient factual evidence from which it could be determined that he intended to do so. We also find this argument unavailing. There is substantial evidence in the record that Joseph intended to rescind the 20-year lease. Michael Wasserberg testified that Joseph only signed the lease because of Sidney's pressure. Three days after the execution of the 20-year lease, Joseph called his attorney and asked that a one-year lease be drafted. Furthermore, the copies of the 20-year lease were all marked "void" and Sharon Wasserberg identified that handwriting on the lease as belonging to Joseph. With respect to the absence of formalities, we note the trial court's finding that Joseph did not generally adhere to legal formalities with respect to his dealings with the land trust and consider his failure to do so when rescinding the lease as consistent with his past practice rather than indicative of a lack of intent. The decision finding that Joseph intended to rescind the lease was therefore not against the manifest weight of the evidence. *Mid-Continent Construction Co. v. Goldberg*, 40 Ill. App. 2d at 262.

Defendants next contend that the trial court committed reversible error in permitting plaintiffs to impeach Sidney five times with his original, unaltered deposition. In this respect, defendants argue that plaintiffs could only use Sidney's corrected deposition with the changes he made pursuant to Illinois Supreme Court Rule 207. (134 Ill. 2d R. 207.) We disagree.

Illinois Supreme Court Rule 212 provides that "[d]iscovery depositions taken under the provisions of this rule may be used: *** (1) for the purpose of impeaching the testimony of the deponent as a witness in the same manner and to the same extent as any inconsistent statement made by a witness." (134 Ill. 2d R. 212(a).) Discovery depositions can also be used as a party admission or for any purpose for which an affidavit may be used. *Skonberg v. Owens-Corning Fiberglas Corp.* (1991), 215 Ill. App. 3d 735, 576 N.E.2d 28; *Security Savings & Loan Association v. Commissioner of Savings & Loan Associations* (1979), 77 Ill. App. 3d 606, 396 N.E.2d 320.

■ In support of their position that the original, unaltered deposition cannot be used to impeach Sidney, defendants cite Illinois Supreme Court Rule 207(a), which provides in pertinent part:

"Unless signature is waived by the deponent, the officer shall instruct the deponent that if the testimony is transcribed he

will be afforded an opportunity to examine the deposition at the office of the officer or reporter, or elsewhere by reasonable arrangement at the deponent's expense, and that any changes in form or substance which the deponent desires to make will be entered upon the deposition with a statement of the reasons he gives for making them." 134 Ill. 2d R. 207.

Initially, we note that defendants' position is contrary to the law of impeachment, which allows a witness to be impeached by a prior inconsistent statement, even though such statement was not made under oath or in a court proceeding. (*Derrico v. Clark Equipment Co.* (1980), 91 Ill. App. 3d 4, 413 N.E.2d 1345.) Defendants' position would protect with absolute impunity statements made at a deposition so long as such statements are subsequently altered pursuant to Supreme Court Rule 207. In so doing, defendants ignore that statements and assertions which may have been superseded for one legal purpose may still be used to impeach a witness' credibility.

The case of *Palumbo v. Kuiken* (1990), 201 Ill. App. 3d 785, 559 N.E.2d 206, is persuasive. In *Palumbo*, the plaintiff swore to certain injuries in answering written interrogatories. He subsequently withdrew his claim for those injuries. The trial court allowed plaintiff to be impeached with those interrogatories even though that particular claim had been withdrawn. In affirming, this court rejected plaintiff's argument, stating that "[i]f his argument is correct, then in any case where a party, before trial, disavows a previous statement, that previous statement may not be used. The unacceptability of the plaintiff's argument is obvious." (*Palumbo*, 201 Ill. App. 3d at 790.) The court then concluded that it should necessarily follow that superseded or withdrawn answers to interrogatories be used for impeachment as well. *Palumbo*, 201 Ill. App. 3d at 791.

An analogy may be drawn to the use of withdrawn and superseded pleadings for impeachment purposes. (See *Winn v. Inman* (1983), 119 Ill. App. 3d 836, 457 N.E.2d 141 (pleadings may be utilized for impeachment purposes if contrary to testimony presented at trial regardless of whether the pleadings have been superseded or withdrawn).) In either case, the mere fact that the parties revised their previous assertions should not preclude the use of the earlier assertions for purposes of impeachment. Once it is established that the earlier version of the deposition transcript accurately reflects the original testimony at the deposition, the determination as to whether the transcript can be used for impeachment purposes is properly left within the discretion of the trial court. (See *Thompson v. Abbott Laboratories* (1990), 193 Ill. App. 3d 188, 205, 549 N.E.2d 1295

("[w]hether to allow the admission of evidence for impeachment purposes is within the trial court's discretion, and a court of review will not disturb the decision of the trial court absent an abuse of discretion"); *Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322.) Otherwise, a deponent would have the power under Rule 207 to insulate his unrehearsed spontaneous testimony given at the deposition from ever serving as a source for impeachment. (See *Chavez v. Watts* (1987), 161 Ill. App. 3d 664, 671-72, 515 N.E.2d 146 (rejecting plaintiff's argument that her deposition could not be used for impeachment purposes because she had reserved signing it in order to check its accuracy because she was fully aware of the existence and substance of the deposition testimony).) Here, Sidney admitted that he had in fact made those prior inconsistent statements from which he was impeached and that they were accurately reflected in the uncorrected transcript. Consequently, the trial judge did not err in allowing plaintiffs' counsel to use the statements to impeach Sidney notwithstanding the fact that Sidney subsequently altered these statements pursuant to Rule 207.

■ Defendants also claim that the trial court erred by considering the numerosity of Sidney's Rule 207 changes to his deposition transcript in assessing his credibility. As their grounds, they urge that there was no testimony at trial which established the accuracy of the original transcript. We agree with that contention. Unlike the use of the deposition for impeachment where Sidney himself admitted making the five statements in question, there was no testimony to establish that the rest of his changes were not occasioned by the erroneous transcription of his testimony on the part of the court reporter. We note that the trial court's credibility inferences were predicated on evidence that Sidney made 145 separate corrections contained on 15 sheets of paper including 74 which involved the total deletion of words from the deposition and 48 where information was added to "clarify" deposition testimony. However, there was no testimony to establish the accuracy of the original transcript and therefore there was no evidence to establish that the alterations were not designed to correct transcription errors. Consequently, the trial court's negative inferences of Sidney's credibility drawn from the numerosity of Sidney's corrections, although perhaps intuitively valid, were not justified by the evidence. It could be argued that the reasons Sidney gave under Rule 207 for making these alterations, particularly where he designated that he was "clarifying" his response, implied that the transcription was an accurate one but that his response needed subsequent revision. Nevertheless, we do not believe that it was

proper for the trial court to draw such an inference without extrinsic authentication of the accuracy of the transcript.

However, the trial court's comments on Sidney's lack of credibility were primarily focused upon Sidney's demeanor at trial. In its decision, the trial court stated that on "numerous occasions in his direct testimony, Sidney Miller's memory was indeed selective" and that it had rarely "encountered a witness who was so insistent on defending his position that his trial testimony was irretrievably hobbled by conspicuous selective memory, self interest, and, in most cases, a lack of reasonableness in his testimony." Sidney's answers on cross-examination were described as "guarded, evasive, equivocal and unresponsive." Moreover, the trial court commented several times during the trial itself on Sidney's poor demeanor and frequently admonished him to answer the question before him and not volunteer favorable information outside the scope of the pending question. In light of the trial court's assessment of Sidney Miller's lack of credibility based upon his testimony at trial, any error which may have resulted from considering the numerosity of alterations to his deposition was harmless. *Ford Motor Credit Co. v. Neiser* (1990), 196 Ill. App. 3d 515, 554 N.E.2d 322; *Senase v. Johns* (1981), 96 Ill. App. 3d 164, 420 N.E.2d 1104.

■ Defendants next contend that the trial court erred by failing to allow them to assert an equitable estoppel defense by conforming the pleadings to the proof pursuant to section 2—616 of the Code of Civil Procedure. (Ill. Rev. Stat. 1989, ch. 110, par. 2—616.) In this respect, defendants argue that the trial court should have allowed them to offer the testimony of Sidney Miller that he gave up his job to manage the currency exchange in reliance on his father's promise that he would receive the currency exchange with a long-term lease.

Section 2—616 of the Illinois Code of Civil Procedure allows amendments to be made to the pleadings "on just and reasonable terms" at any time prior to the entry of a final judgment. (Ill. Rev. Stat. 1989, ch. 110, par. 2—616.) A trial court's decision to amend or refuse to amend pleadings will not be reversed absent an abuse of discretion. (*National Surety Corp. v. Fast Motor Service, Inc.* (1991), 213 Ill. App. 3d 500, 572 N.E.2d 1083; *Friestedt v. Chicago Transit Authority* (1970), 129 Ill. App. 2d 153, 262 N.E.2d 771.) In determining whether the trial court abused its discretion in refusing to allow a party to amend the pleadings, a reviewing court will look to see if the proposed amendment would further the ends of justice. (*Newey v. Newey* (1991), 215 Ill. App. 3d 993, 576 N.E.2d 137.) Both the timeliness of the amendment and the potential prejudice to the opposing party

will be considered in determining whether an amendment should be allowed. *Healy v. Bearco Management, Inc.* (1991), 216 Ill. App. 3d 945, 576 N.E.2d 1195.

The trial court was well within its discretion in denying defendants leave to amend. No indication of defendants' equitable estoppel theory was ever presented to the trial court in the pleadings or arguments prior to trial. (*Mundt v. Ragnar Benson, Inc.* (1974), 18 Ill. App. 3d 758, 310 N.E.2d 633.) Nor is there evidence that plaintiffs were aware of these facts and this defensive theory at an earlier time. Conversely, the information which defendants first sought to elicit in the middle of trial was fully known to them prior to the filing of this lawsuit. Moreover, the prejudice suffered by plaintiffs might well have been significant considering that plaintiffs had put on their entire case in chief prior to this theory being raised and defendants had called nine witnesses in its own case prior to offering this theory. (*Tongate v. Wyeth Laboratories* (1991), 220 Ill. App. 3d 952, 580 N.E.2d 1220.) In light of defendants' midstream alteration of their theory of the case through the addition of this defense, we cannot say that the trial court committed an abuse of discretion in denying leave to amend the pleadings. *American Pharmaseal v. T E C Systems* (1987), 162 Ill. App. 3d 351, 515 N.E.2d 432.

■ Defendants next contend that plaintiff Sharon Wasserberg is not entitled to equitable relief under the doctrine of unclean hands. In this respect, defendants argue that Sharon Wasserberg breached the fiduciary duty she owed to the currency exchange as one of its directors by bringing suit to vitiate the lease best benefiting the corporation and tortiously interfered with the contract between the bank and the currency exchange by contacting attorney Heisler in an attempt to shorten the term of the lease.

At the outset we note that this issue was not raised before the trial court and as such is waived for purposes of review. (*Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 324 N.E.2d 417.) Moreover, even if the merits of this argument were reached, Sharon would not be barred from recovery by the doctrine of unclean hands. This doctrine prohibits "one seeking equity [from] tak[ing] advantage of his own wrong." (*Jaffe Commercial Finance Co. v. Harris* (1983), 119 Ill. App. 3d 136, 140, 456 N.E.2d 224.) The invocation of the doctrine of unclean hands is within the trial court's discretion and its application has not been favored by the courts. (*Jaffe*, 119 Ill. App. 3d at 140.) In looking at whether unclean hands are present, the court will look to the intent of the party, not the effect of its actions, and will only find

unclean hands present if there has been fraud or bad faith. *Jaffe*, 119 Ill. App. 3d at 140.

Here, there is enough evidence in the record to support a determination that Sharon's conduct was proper insofar as she attempted to initiate the rescission of a long-term lease found at trial to be the product of undue influence. Furthermore, there could be no tortious interference in seeking such rescission where her father represented both sides of the transaction and agreed to the rescission as well as where such lease was procured through undue influence. Thus, the record at trial can well support a finding under these circumstances that Sharon's initiatives with respect to the long-term lease were not based in fraud or bad faith (*Cole v. Guy* (1989), 183 Ill. App. 3d 768, 539 N.E.2d 436; *Comedy Cottage, Inc. v. Berk* (1986), 145 Ill. App. 3d 355, 495 N.E.2d 1006), but that they were designed to protect her own legitimate interests as well as those of her father.

■■■ Defendants next contend that the plaintiffs waived their right to argue that the lease was rescinded when they accepted rent payments from November 1986 through March 1988, thereby receiving the benefits of the lease. Defendants contend that the plaintiffs never announced that these rent payments were being accepted pursuant to the five-year lease declared valid by the trial court.

Defendants have waived this argument for purposes of review because they failed to raise this issue before the trial court. (*Kravis v. Smith Marine, Inc.*, 60 Ill. 2d 141, 324 N.E.2d 417.) The question of whether a known right has been waived is clearly one for the fact finder and its advancement for the first time on appeal is not only improper but impractical as well. Furthermore, even if we decided to reach the merits of this issue, we would find in favor of the plaintiffs. There was no "clear, unambiguous evidence" presented at trial which would indicate that there has been an "intentional relinquishment of a known right" on plaintiffs' part. (*Illinois Rockford Corp. v. Dickman* (1988), 167 Ill. App. 3d 113, 119, 520 N.E.2d 1184.) The acceptance of rent as payment for space occupied by defendants cannot be said to have constituted a valid waiver of the right to rescind the 20-year lease since such payments would have been required in either case whether under the five-year or the 20-year lease.

■■■ Defendants' final contention is that the trial court's decision should be reversed because it is legally inconsistent. As previously mentioned, the trial court found that the five-year lease was controlling, that the 20-year lease was the product of undue influence and that, even if the 20-year lease was not the product of undue influence, it was effectively cancelled by Joseph's letter of direction to the trust.

We find no inconsistency in the trial court's decision. Findings in the alternative are not inconsistent as long as each rationale is independently sustainable. Here, the trial court as the finder of fact made two separate determinations, one on the validity of the execution of the lease in October 1986, and one on its rescission on November 13, 1986. A finding that the lease was procured through undue influence does not preclude a finding that the lease was subsequently rescinded by a voluntary act; these two findings are in fact entirely consistent as one who was unduly influenced would likely act to rescind the influenced document when freed of such influence. The trial court's findings in the alternative are consistent with each other and are supported by the record.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNULTY and COUSINS, JJ., concur.