AETNA SCREW PRODUCTS COMPANY, Plaintiff and Counterdefendant-Appellee, *v.* PHILIP BORG, Defendant and Counterplaintiff-Appellant.

First District (4th Division)   No. 81—1537

Opinion filed March 24, 1983.—Rehearing denied May 3, 1983.

Beermann, Swerdlove, Woloshin, Barezky & Berkson, of Chicago (Miles

N. Beermann, Howard A. London, and Susan L. Brody, of counsel), for appellant.

Feiwell, Galper & Lasky, Ltd., of Chicago (George S. Feiwell, Daniel C. Meenan, Jr., and Craig P. Ehrlich, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, Aetna Screw Products Company (Aetna), brought an action in the chancery division of the circuit court of Cook County seeking a declaratory judgment that defendant, Philip Borg, owed Aetna $145,359.92 pursuant to a tax indemnification agreement between the parties. Borg counterclaimed for reformation of the tax indemnification clause of the contract. Following a bench trial, the trial court held that Borg had not proved his counterclaim for contract reformation and that he owed Aetna $173,900.81 in damages and interest for breaching the tax indemnification provision of the contract governing the sale of Borg's stock to Aetna.

Borg appeals, claiming that the trial court erred by (1) denying his counterclaim for reformation, (2) denying his demand for a jury trial, (3) limiting his discovery, (4) enforcing an illegal contract, (5) ruling against him on several specific evidentiary matters, and (6) entering judgment against him in the amount of $173,900.81.

We affirm in part, reverse in part, and remand with directions.

FACTS

In 1963, Philip Borg and Frank Valerio formed Aetna Screw Products Company, a corporation which distributed screw products. Borg and Valerio each owned 50% of Aetna's stock and fully participated in all phases of the company's operations. Two years later the two men also formed Bor-Val, a partnership whose sole business was to purchase screw products from Aetna and package them according to the particular specifications of one of Aetna's largest accounts. Both businesses operated from the same location.

Aetna, whose fiscal year ended each June 30, used the accrual method of accounting, recording income and expenses at the time the right to or liability for payment accrued regardless of when the money actually was received or paid. Bor-Val, on the other hand, was a calendar year taxpayer utilizing a cash basis of accounting, recording income and expenses at the time money actually was received or disbursed.

Aetna's inventory procedure was to record each purchase of products on inventory cards and then to subtract the quantity and cost of

each lot sold as it was removed from stock. For several years prior to 1974, Aetna prepared its tax returns by taking inventory quantities from the cards, calculating the appropriate value, reducing that figure, and using the reduced value in calculating net profits and income tax. When the reduced closing inventory was subtracted from the combined opening inventory and cost of additions to inventory, the result was an apparently higher cost of goods sold than was actually the case. When this artificially high cost figure was subtracted from gross profits, the result was an artificially low net profit figure, which in turn resulted in artificially low income taxes. Testimony at trial established that as a result of continuing this practice for several years, Aetna had written down its inventory nearly 50% and therefore had underpaid its taxes by a substantial amount.

In addition to writing down its reported inventory, Aetna also reduced its taxes in one year by recording income from the Bor-Val partnership in a manner inconsistent with its established accounting method. Instead of recording the income when the right to it accrued, Aetna recorded income from Bor-Val when payment was received. This improper deferral of income further reduced Aetna's net profits and therefore taxes for one year.

In 1974, Valerio and Borg agreed to terminate their business relationship; Valerio bought out Borg's entire interest, paying $104,000 for the liquidation of the Bor-Val partnership, $98,000 for the profit-sharing plan, and $453,500 for Borg's 50% stock interest in Aetna. In total, Borg received over $650,000.

As originally drafted, the written contract setting forth the terms of the sale did not contain any provision for Borg's sharing in any additional tax liability. The final negotiations concerning the sale took place at a meeting between Borg, Valerio, Alfred Cowan, Aetna's accountant, and Fred Carman, the attorney who drafted the contract of sale. At that meeting, each clause of the purchase agreement was read aloud and discussed, and the following clause was added:

> "4. *Additional Income Taxes*
>
> Borg shall be responsible to Aetna for one-half of any additional U.S. or Illinois income taxes, together with interest and penalties thereon, if any, (collectively referred to as a 'tax deficiency') which Aetna may be required to pay with respect to any of its fiscal years ending on or before June 30, 1974. Aetna shall be deemed to be required to pay such tax deficiency whether as a result of decision by court, or by agreement between Aetna and the Internal Revenue Service. Aetna shall promptly notify Borg of the amount of such tax deficiency and

shall furnish him with written evidence of the details thereof. Borg shall pay Aetna one-half of the amount of such tax deficiency within 30 days after being notified thereof."

Although the four participants in the contract meeting testified to seriously conflicting versions of the discussion concerning the above clause, all at least agreed that the tax indemnification paragraph was included in the contract by general concurrence. At the conclusion of the December 30, 1974, meeting, Borg and Valerio executed the final version of the agreement.

Within the next year, Sheldon Drobny replaced Cowan as Aetna's accountant and conducted a complete review of the corporation's entire financial structure. He advised Valerio that the cushion of understated inventory should be eliminated to avoid potential criminal tax charges. An outside tax consultant advised Valerio to follow certain Internal Revenue Service guidelines and revenue rulings and file either a request to change Aetna's accounting method or a "correction of error" form eliminating the inventory write-down and correcting the Bor-Val accounts receivable.

In 1977, the Internal Revenue Service audited Aetna's books and records. As a result, the inventory figure was corrected and carried back, and past income from Bor-Val was moved back and entered in the year earned. Aetna was then assessed approximately $293,000 in additional taxes, of which more than $290,000 was listed as attributable to 1974. However, when Aetna notified Borg of the audit results and billed him for half of the additional amount, $145,359.92, Borg declined to pay, whereupon Aetna began proceedings against him.

As originally filed on September 30, 1977, Aetna's two-count complaint requested an injunction, an accounting, a declaratory judgment, and "other relief." The injunction was directed at Borg's alleged violation of a noncompetition agreement in the contract, and both the accounting and declaratory judgment claims were aimed at the additional taxes Borg allegedly owed. Borg filed a motion to dismiss or, in the alternative, to transfer the case to the extraordinary remedies section of the law division of the circuit court of Cook County. The transfer was granted, and the court gave both parties additional time to file memoranda arguing the merits of the motion to dismiss.

While the motion was pending, Borg requested and was granted leave to file an answer with affirmative defenses, a jury demand, and a counterclaim for reformation of the contract based on alleged mutual mistake and nonconformity of the written contract to the actual understanding of the parties. Because contract reformation is an equitable action, Aetna moved for a transfer back to chancery; mean-

while, the trial court dismissed Aetna's request for a declaratory judgment and granted Aetna 28 days to file an amended complaint in the law division.

Borg's answer was already on file along with his jury demand. Once the case was moved back to chancery, Borg requested that his contract reformation counterclaim be heard first but reasserted his claim to a jury trial on Aetna's amended complaint for breach of contract. His jury demand was denied on the ground that any decision on the contract reformation claim would be *res judicata* on the issues of breach of contract and damages set forth in Aetna's amended complaint. Over Borg's objection, on June 30, 1980, the trial judge proceeded to hear the case.

In addition to refusing Borg's jury demand, the trial court also granted Aetna's motion to limit Borg's discovery to the period ending December 30, 1974; further, Borg was denied discovery of any corporate fiscal activities subsequent to June 30, 1974, on the ground that because Borg's liability terminated then, no corporate events after that date could lead to material or relevant evidence.

At the conclusion of the contract reformation proceedings, the court found that the agreement as written embodied the parties' actual intent; the judge therefore ordered judgment in favor of Aetna on Borg's counterclaim for reformation. On December 10, 1980, trial began on Aetna's amended complaint for breach of contract.

Preliminary testimony by Valerio and Borg established the facts of the Internal Revenue Service audit, the assessment of back taxes, and Borg's failure to pay. Tax experts called as witnesses by the parties testified to the basis for the assessment of back taxes.

On April 14, 1981, the trial judge entered judgment against Borg for $172,900.81, one-half of the increase in tax liability for 1974 plus statutory interest. Borg then filed notice of appeal.

OPINION

I

Borg's first claim on appeal is that the trial court's denial of his counterclaim for reformation of the contract was contrary to the manifest weight of the evidence. In order to establish a case for reformation, a litigant must prove that the written contract did not reflect the parties' true bargain because of (1) mutual mistake of the parties or (2) unilateral mistake by one party caused by the fraud of the other. (*Parrish v. City of Carbondale* (1978), 61 Ill. App. 3d 500, 378 N.E.2d 243.) Borg maintains that he has proven a clear case of mu-

tual mistake because the parties intended that Borg's tax liability not extend to any assessment resulting from adjustments to inventory and accounts receivable; however, the parties made a mutual mistake in estimating the legal effect of omitting the liability limitation in their written contract. We find Borg's argument to be without merit, for he has misperceived and misapplied the concept of mutual mistake.

■ Before a court may reform a contract on grounds of mutual mistake, three requisites must be fulfilled: (1) there must have been an agreement between the parties; (2) the parties must have agreed to put their agreement into writing; and (3) a variance exists between the prior agreement and the writing. (J. Calamari & J. Perillo, Contracts sec. 9—31, at 313 (2d ed. 1977), citing Malone, *The Reformation of Writings for Mutual Mistake of Fact*, 24 Geo. L. J. 613 (1936).) Further, all three of these requisites must be established by clear and convincing evidence, a higher standard than the preponderance of the evidence standard applicable in most civil suits. *Texas Eastern Transmission Corp. v. McCrate* (1979), 76 Ill. App. 3d 828, 395 N.E.2d 624.

As noted earlier, all four participants in the contract meeting testified to widely varying versions of the discussion concerning the tax indemnification provision. The testimony included (1) Valerio's denial that any discussion of understated inventory occurred at all, (2) Cowan's and Carman's statements that the discussion included advice to agree orally to omit reference to inventory, and (3) Borg's assertion that both parties orally agreed to omit the reference and not to hold Borg liable for any taxes resulting from correction of the understatement. Such disagreement does not approach the level of certainty needed to justify reformation of a contract provision. Even if Borg were able to prove that, contrary to the trial court's finding, the manifest weight of the evidence favored his position, we would not find him entitled to reformation.

The essence of Borg's argument is that it was the mutual intent of both parties to limit Borg's potential liability to one-half of any additional taxes and penalties attributable to causes other than correction of inventory and accounts receivable. The parties agreed to exclude this limitation from their written contract to avoid "red-flagging" the inventory problem in the likely event that the Internal Revenue Service examined the contract during an audit of Borg's tax return. Borg argues that the court should rewrite the contract to make it conform to the original intent of the parties because there was a mutual mistake of fact. (*Stoerger v. Ivesdale Co-op Grain*

*Co.* (1973), 15 Ill. App. 3d 313, 304 N.E.2d 300.) Reduced to its simplest form, Borg's contention is that he is entitled to reformation because both parties mutually intended to abide by the oral agreement, they mutually agreed to omit the contested term, and Borg now sees that to do so was a mistake.

■ "The rule of law that a mistake ***, to be susceptible of correction, must be mutual, does not mean that both parties must agree *** that the mistake was in fact made." (*Matthews v. Whitethorn* (1906), 220 Ill. 36, 42, 77 N.E. 89, 91.) "The province of reformation is to make a writing express the bargain which the parties desired *to put in writing.* [Citation.] Agreements of which they did not desire written expression will not be put into writing by decree of the court." (Emphasis added.) 13 Williston on Contracts sec. 1549, at 132 (3d ed. 1970).

Accordingly, we find no error in the trial court's denial of Borg's claim for reformation of the contract.

## II

Borg's next claim is that the trial court erred in enforcing an illegal contract provision to which Aetna was in *pari delicto.* Borg maintains that *Manning v. Metal Stamping Corp.* (N.D. Ill. 1975), 396 F. Supp. 1376, *aff'd* (7th Cir. 1976), 530 F.2d 980, establishes that in Illinois, a contract innocent in appearance but otherwise tainted by or connected with illegal activity will not be enforced. An examination of that case discloses no such broad rule.

The agreement at issue in *Manning* was a contract engaging the plaintiff as the defendant's representative in the acquisition of contracts to manufacture license plates for various States. Both parties understood that Manning was to purchase influence with Paul Powell, then Illinois Secretary of State, and other Illinois officials in order to secure the contract for Illinois plates. After Powell died, the parties signed a second contract continuing their business relationship. While the second contract appeared innocent on its face, it specifically acknowledged the existence of the earlier agreement, the one both parties agreed was illegal. No such connection to the alleged tax evasion scheme appears anywhere in the contract clause at issue.

Furthermore, understating inventory is not necessarily illegal. Inventory write-downs, including those employing a flat percentage method, do not necessarily violate the regulations of the Internal Revenue Service. Even when a company is unable to provide objective evidence to justify its inventory write-down, the usual result is simply the Commissioner's disallowance of the reduced figure, not an official

accusation of illegality and criminal tax evasion. (See *Thor Power Tool Co. v. Commissioner of Internal Revenue* (1979), 439 U.S. 522, 58 L. Ed. 2d 785, 99 S. Ct. 773.) We note in this regard that no penalties were assessed against Aetna in connection with the Internal Revenue Service correction of the understatement of inventory.

A contract that appears innocent on its face is presumed to be legal. (*Shanahan v. Schindler* (1978), 63 Ill. App. 3d 82, 379 N.E.2d 1307.) In addition, in a nonjury case, a reviewing court will not substitute its judgment on the credibility of witnesses for that of the trial court unless the manifest weight of the evidence fails to support the trial court's findings. (*Brown v. Zimmerman* (1959), 18 Ill. 2d 94, 163 N.E.2d 518.) Borg is arguing that had the tax indemnification provision been reformed as he requested, he could not be held to its terms because it then would have been illegal.

■ Borg's inability to provide clear and convincing evidence to support his argument for contract reformation also defeats his argument that paragraph 4 of the agreement was illegal and therefore should not be enforced. The fact that we affirmed on alternate grounds the trial court's decision on the reformation issue does not discredit the judge's finding that Borg had not met the appropriate evidentiary standard. Accordingly, we find no error in the trial court's decision that the tax indemnification provision in paragraph 4 should be enforced.

## III

The third claim of error Borg raises on appeal is the trial court's denial of his right to a jury trial on the issues of law raised by Aetna's amended complaint. The basis of Borg's claim is the constitutional provision, "The right of trial by jury as heretofore enjoyed shall remain inviolate." (Ill. Const. 1970, art. I, sec. 13.) The substantive right to trial by jury thus guaranteed is to be defined by examining the history of the common law. (*People v. Brumfield* (1977), 51 Ill. App. 3d 637, 366 N.E.2d 1130.) A complaint alleging breach of contract and resulting damages is an action cognizable at common law. Therefore, once Borg timely filed his jury demand in conformity with the requirements of section 64 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 64), he was guaranteed his right to a jury trial until he waived it or the court correctly determined that its holding on the equitable issues, heard first, was *res judicata* as to all legal issues as well. *Power Electric Contractors, Inc. v. Maywood-Proviso State Bank* (1978), 60 Ill. App. 3d 685, 377 N.E.2d 142.

Aetna would have us believe that by proceeding to trial first on

the equitable issue of contract reformation, Borg waived his demand for jury trial on the legal issues. Indeed, despite vigorous argument and supporting cases presented by Borg, the trial judge himself stated, "[O]nce equity assumes jurisdiction, it clings for all purposes" and agreed with Aetna that Borg's choice of forum, a result of his equitable counterclaim, constituted a waiver of his jury demand.

The court bolstered its decision by agreeing with the *res judicata* argument advanced by Aetna:

> "[T]here is no way under the law or in chancery that you [Borg] could ever segregate this damage issue or not cause it to be *res judicata* sometime or other. It would appear to me that *** all of this is intermingled. You could never prove your damage issue *** without having to bring in the very contract that is in issue here.
>
> Your theory seems to be that I could move on the reformation *** one way or the other, that then the damage factor is so separate and distinct that you do not have to bring in the [same] factual situation as ultimately you will have to do in this court in the reformation.
>
> In reading it, it seems to me to be so commingled, *** I'm going to deny the request for the jury demand."

■ Contrary to the holding of the trial judge, we find that Borg did not waive his right to trial by jury either when he filed his counterclaim in equity or when he requested that the reformation issue be heard first. Even *Power Electric Contractors, Inc. v. Maywood-Proviso State Bank* (1978), 60 Ill. App. 3d 685, 377 N.E.2d 142, the case cited by Aetna as authoritatively establishing waiver of a jury trial in such a situation, does not, in fact, so hold. *Power Electric* holds, "[B]ecause of the identity of the factual issues raised by the complaint and by the counterclaim, defendants' conduct in proceeding to trial before [the chancery judge] amounted to a waiver of their jury demand. *** [T]he factual issues upon which depended [both defendant's legal and plaintiff's equitable rights] were identical." (60 Ill. App. 3d 685, 689, 377 N.E.2d 142, 145.) *Power Electric* is clearly a case wherein a decision on the equitable claim was *res judicata* as to the legal claim. In the instant case, the only similarity between the equitable and legal issues is that Borg's counterclaim for reformation was the same as one of his four affirmative defenses filed in his answer to Aetna's breach of contract action. We do not find in that one repetition sufficient identity of issues and facts to create a situation in which a decision on the equitable claim would be *res judicata* as to the legal claim.

Borg's counterclaim sought to establish the agreed-upon terms of the contract itself; Aetna's legal action alleged a breach of at least one of those contract terms as written. A decision on the meaning of one contract term clearly does not dispose of an allegation that that term was in fact breached and what damages resulted. Relevant evidence pertinent to the reformation action included only those events leading up to the execution of the contract. The breach of contract action, on the other hand, required evidence of the audit, its effect on the tax liability for the years audited, and a determination of the additional taxes which should be assessed against Borg under the agreement. All that the trial court decided by correctly refusing to reform the contract was that Borg's liability for additional taxes was not restricted to a certain type or source of increased tax assessment; he would be liable for one-half of any tax deficiency that Aetna was required to pay for any period through June 30, 1974.

Precedential authority instructive on the instant case is that found in *Rozema v. Quinn* (1964), 51 Ill. App. 2d 479, 201 N.E.2d 649, a case involving a legal counterclaim filed in response to a complaint filed in chancery. In that case, the defendants, who originally had requested a jury trial on their legal counterclaim, also requested reference to a master in chancery; when the reference was granted, plaintiffs neither filed their own jury demand nor made any objection to the court's decision that both causes should be tried together. Defendants' later motion to withdraw their jury demand was granted over plaintiffs' objection that they had a right to a jury trial on the legal issues raised in defendants' original counterclaim. The appellate court, noting that the plaintiffs had never filed their own jury demand, concluded,

> "[W]here a law and equity action are joined but a proper demand for a jury in the law action is made, the latter cannot be tried with the chancery action. [Citations.] ***
>
> In the case at bar, the defendants' counterclaim, being an action at law for a money judgment, was within the class of cases to which there existed a right to trial by jury at the request of either of the parties. ***
>
> *** Since the jury was waived by action of the parties, the chancellor had jurisdiction to hear both the legal and equitable actions." 51 Ill. App. 2d 479, 486-87, 201 N.E.2d 649, 653.

It is clear to us that not only did Borg make a proper jury demand, but he strongly and correctly objected to the court's decision that the causes of action were identical. In view of our finding that a decision in the reformation action would not be *res judicata* in the

contract action, we reverse the trial court's denial of Borg's jury demand and remand the case for further proceedings in accordance with our decision. Parenthetically, we note that the trial court has already ruled as to the meaning of paragraph 4 of the agreement and the parties are bound by that finding. Consequently, the subsequent trial must be limited to the issues stated in this opinion, and the evidence which may be presented must relate solely to Borg's liability for one-half of the additional taxes which Aetna may prove it was required to pay for any of its fiscal years ending on or before June 30, 1974. Because Borg is entitled to a new trial on Aetna's breach of contract action, to be held before a jury, we need not address the additional claims of error in evidentiary rulings.

Affirmed in part, reversed in part, and remanded with directions.

JOHNSON and JIGANTI, JJ., concur.