MARY SCHIVARELLI *et al.*, Plaintiffs-Appellees, v. THE CHICAGO TRANSIT AUTHORITY, Defendant-Appellant.

First District (4th Division)    No. 1—02—1735

Opinion filed January 20, 2005.

Robert S. Rivkin, Thomas J. Bamonte, Ellen L. Partridge, and Stephen L. Wood, all of Chicago Transit Authority, of Chicago, for appellant.

Baker & McKenzie, of Chicago (Sidney M. Kaplan and Anthony G. Stamato, of counsel), for appellees.

JUSTICE QUINN delivered the opinion of the court:

In March 1983, plaintiffs, Mary and Peter Schivarelli, entered into a lease agreement with defendant, the Chicago Transit Authority (CTA), to lease the unused space under the Fullerton El stop in Chicago. Under the agreement, plaintiffs agreed to construct and operate a hot dog stand, Demon Dogs, at the site. In 1997, the CTA

discovered that it had mistakenly been paying the utility expenses for Demon Dogs with its own utility bills for the Fullerton station. The CTA sent plaintiffs a notice of default for the accrued utility costs, and in response, plaintiffs filed a complaint for declaratory judgment as to who was obligated to pay the utilities. In June 2002, following a bench trial, the trial court ruled in favor of plaintiffs by finding that the CTA was responsible for paying the utilities at plaintiffs' hot dog stand. The court reformed the written lease to reflect this obligation.

The CTA appeals, arguing that the trial court erred in reforming the lease agreement when (1) the alleged modification of the lease agreement was oral and not intended to be reduced to writing, (2) the CTA did not agree to this oral modification, and (3) plaintiffs' evidence did not support a finding by clear and convincing evidence. We reverse and remand.[1]

## I. BACKGROUND

In the early 1980s, Peter Schivarelli approached Merritt Kotin, head of the CTA's real estate department, to inquire about leasing the unused space underneath the elevated tracks across from the Fullerton Avenue station, at 940-44 W. Fullerton Avenue. On March 1, 1983, Schivarelli and Kotin executed a lease agreement for the property, which had been drafted by Kotin. The lease contained pre-printed form lease provisions as well as typewritten additions.

Under the written lease agreement, the rent was set at $325 per month, fixed for a five-year term, with annual escalations of, at most, 25% of the rate of inflation. This monthly rent was set below market rates. The March 1983 lease also contained an investment guarantee for plaintiffs' financial investment. Plaintiffs agreed to construct and operate a freestanding hot dog stand on the property. The CTA agreed to reimburse plaintiffs for the costs of construction in the event the lease was terminated for any reason. The amount of the CTA's obligation was set by amortizing the initial construction cost of $152,513 by straight-line depreciation over 20 years. As written, the lease compelled the CTA to purchase the hot dog stand at the end of its 10-year term for approximately $76,250.

The March 1983 lease provided plaintiffs with one option to renew the lease for an additional five-year term, to begin March 1, 1988.

---

[1]This case initially was assigned to Justice Neil Hartigan. Oral argument was heard on May 6, 2003. On May 31, 2004, Justice Hartigan resigned and Presiding Justice Patrick J. Quinn was assigned as authoring judge. Justice Calvin Campbell was assigned as the third panel member. Justice Campbell has read the parties' briefs and listened to the tape of the oral argument in this case.

Rent was to be set by an appraiser at the end of the first five-year term. The lease directed the appraiser to consider the value of plaintiffs' unamortized investment in the hot dog stand when setting the rent for the second term.

Section 3 of the March 1983 lease provided for the payment of utilities. Section 3(a) of the lease stated that "Lessee shall pay, as additional rent, all water rents and gas, light, power and other bills and charges." This section also provided that if the utilities were not billed separately then the lessee shall pay an equitable part as determined by the Chicago Transit Authority Board.

The lease also contained sections that were lined out. One of these was section 11. Section 11 contained a preprinted sentence that said: "Lessor shall be under no obligation as to heating, lighting or furnishing power to said premises."

In February 1983, Kotin presented the lease to the Chicago Transit Authority Board (the Board), who approved the lease by a majority vote. During his trial testimony, Kotin said that every agreement between the CTA and an outside party needed to be presented and approved by the Board in order to be final and legally binding. To aid in his presentation, Kotin prepared a lease summary for the Board outlining the terms of the lease. Kotin's summary did not mention the payment of utility expenses.

In August 1985, the parties entered into an amended lease agreement. On its face, the amended lease "cancels and supercedes all leases previously issued for this location." The amended lease contained the same provisions with respect to utilities as the March 1983 lease. The lease gave plaintiffs additional five-year options to renew the lease. Under the amended lease, the rent for 1983 to 1988 was set at $325, for 1988 to 1993 at $425, for 1993 to 1998 at $525, and for 1998 to 2003 at $625. The CTA continued to guarantee plaintiffs' investment, and the amended lease now provided that the CTA buy the building for the unamortized original cost using straight-line depreciation for a 20-year term.

The amended lease was reviewed by the CTA's appraisers, James O. Hamilton & Co. The appraisers concluded that the proposed lease was equitable and in the CTA's best interests. According to the appraisal report, the rent charged under the March 1983 lease was set below fair market value due to a number of factors, one of which was that plaintiffs had "constructed a glass foyer and [they allow] CTA patrons to use this foyer as well as the front (south) portion of the restaurant. This is a valuable rider service in inclement weather."

Again, Kotin presented the amended lease to the Board for approval. On its face, the amended lease stated that plaintiffs were

responsible for utilities, and Kotin's lease summary to the Board did not contradict the lease as to who was responsible for payment of the utilities. The Board approved the amended lease.

In 1988, plaintiffs exercised their first option to renew for a second five-year term, and they did so again in 1993. At that time, CTA did not consider plaintiffs in default under the lease for failure to pay utilities.

During 1996 and 1997, Peter Schivarelli negotiated with the CTA for a further extension of the lease agreement that would allow plaintiffs to remain at the property beyond the final expiration in March 2003. A final proposed lease agreement was circulated in October 1997. While in negotiations, the topic of utilities was discussed. An early draft of the proposed lease repeated the earlier lease agreements that plaintiffs pay the utilities. Plaintiffs' attorney edited the draft to change responsibility from "lessee" to "lessor." Upon noticing this edit, counsel for the CTA contacted plaintiffs' attorney to inquire about the change. At that point, plaintiffs' attorney "dropped the whole idea" and returned a draft that made plaintiffs responsible for utility payments.

Peter Schivarelli signed the final copy of the proposed lease agreement, but the CTA never executed it. Plaintiffs contended at trial that an ordinance passed by the Board in December 1995 authorized the chairman of the CTA to execute two additional options to renew and bound both parties to the final draft of the proposed lease agreement.

In late 1997, the CTA discovered that it had inadvertently been paying all of the utilities for plaintiffs' business. The CTA's maintenance department was responsible for receiving, reviewing, and paying utility bills. From the time of construction of Demon Dogs in 1983 until late 1997, the utility bills were sent to the CTA maintenance department and paid in the normal course of business. When CTA senior management learned of the error, it began an investigation. It was revealed that the written leases with plaintiffs obligated plaintiffs to pay for the utilities. In December 1997, the CTA sent plaintiffs a letter requesting that plaintiffs provide the CTA with evidence of payment of the utilities. Plaintiffs' response stated that Peter Schivarelli and Kotin had created an agreement under which the plaintiffs enlarged the facility's vestibule in exchange for the CTA's agreement to pay plaintiffs' utilities.

In January 1998, the CTA sent plaintiffs a notice of default and requested payment of utility expenses in the amount of $152,654.17, which was itemized on an exhibit attached to the notice. After the notice was served, the utilities were placed in plaintiffs' name and they have paid utility expenses since that time.

In February 1998, plaintiffs filed their complaint against the CTA seeking a declaration that they were not responsible for paying the utilities from 1983 to 1997 and asking the trial court to reform the August 1985 lease agreement to make the the CTA responsible for utility payments until the expiration of the lease in 2003. In their complaint, plaintiffs alleged that after the parties entered into the March 1983 lease agreement, the CTA asked them to modify their plans and install a vestibule for CTA passengers. In exchange for this alteration, the CTA agreed to pay plaintiffs' utilities. Plaintiffs contended that section 3 of the August 1985 lease agreement was not intended to be part of the lease and was included by mutual mistake of the parties.

In April 2002, the trial court conducted a bench trial on plaintiffs' complaint.

Peter Schivarelli testified as follows. It was his idea to build the hot dog stand under the Fullerton El tracks and he approached the CTA in the early 1980s to begin negotiations. He approached Kotin to discuss the possible lease agreement. After some initial skepticism, the parties entered into the March 1983 lease agreement.

Construction began on the hot dog structure after the March 1983 lease was signed. Schivarelli testified that while the foundation was under construction, Kotin and several other people from the CTA came to the site. During this visit, Kotin spoke to Schivarelli about a possible modification of the building plan. He asked Schivarelli if he would agree to put in an oversized vestibule for CTA passengers. Schivarelli agreed to the proposed alteration after speaking with his contractor.

Schivarelli met with Kotin to advise him of his agreement to the change. According to Schivarelli, Kotin "said to him, you know, we basically have a policy of not charging any of our tenants utilities, we will pick up your utilities, which we didn't originally do in your original deal." Schivarelli never received a utility bill.

Schivarelli also testified that the August 1985 amended lease was created to provide for more extensions of the lease. The utility/vestibule agreement was not contained in the amended lease because, as far as Schivarelli was concerned, "the utility issue was resolved." He testified that the utilities/vestibule agreement was not reduced to writing nor was it intended to be included in a future lease.

Kotin also testified at trial about his involvement in the leases with plaintiffs. On direct examination, Kotin testified that after the execution of the March 1983 lease, he went to observe construction. He stated that CTA engineering employees had expressed interest in having the vestibule enlarged and additional fireproofing materials

added to the roof of Demon Dogs. According to Kotin, Schivarelli wanted concessions for complying with those two requests. Kotin testified that he then told Schivarelli that the CTA would pay plaintiffs' utilities. Kotin also testified that in order for the utilities/vestibule agreement to be effective, it had to be reduced to writing and approved by the Board. His explanation as to why no documents were produced indicating that the Board approved this agreement was that "they must have been lost."

On cross-examination, Kotin testified that it was his understanding that the payment of utilities by CTA was part of the original agreement in the March 1983 lease. He also stated that it was not typical for the CTA to pay the utilities of its tenants and that such an agreement would be something he would need to present to the Board. Kotin said that the lining out of section 11 in the original lease indicated that the CTA agreed to pay the utilities.

Michael Cardilli also testified at trial. At the time the original lease agreement was executed, Cardilli was the chairman of the CTA. He testified at trial that he had not reviewed the lease in 18 years and had no idea what was in the lease regarding responsibility for payment of utilities. He also stated that his understanding was that the CTA retained control of the property and based on that it was to pay the utilities. Cardilli testified that under the rules of the Board, no one could make an oral agreement that would have existed apart from a written agreement.

In June 2002, the trial court ruled in favor of plaintiffs and ordered reformation of the August 1985 lease agreement by striking section 3(a) to make the CTA responsible for utility payments. The court relied on Schivarelli's account and the agreement of Cardilli and Kotin as to that arrangement.

This appeal follows.

## II. ANALYSIS

### Reformation of the Contract

On appeal, the CTA argues that the trial court erred in reforming the August 1985 lease agreement because (1) the utilities/vestibule agreement was never reduced to writing, (2) no evidence was presented that the Board agreed to the utilities/vestibule agreement, and (3) plaintiffs did not present sufficient evidence to satisfy the clear and convincing evidence burden of proof. The CTA also asserts that plaintiffs failed to support their affirmative defenses of *laches*, estoppel, waiver and unclean hands at trial.

A written contract may be reformed to reflect the intention of the parties and the agreement between them. *Suburban Bank of*

*Hoffman-Schaumburg v. Bousis*, 144 Ill. 2d 51, 58, 578 N.E.2d 935, 939 (1991).

> " 'An action to reform a written agreement rests upon a theory that the parties came to an understanding, but in reducing it to writing, through mutual mistake, or through mistake of one side and fraud on the other, some provision agreed upon was omitted, and the action is to so change the instrument as written as to conform it to the contract agreed upon, by inserting the provisions omitted or striking out the one inserted by mutual mistake.' "
> *Suburban Bank*, 144 Ill. 2d at 58-59, 578 N.E.2d at 939, quoting *Harley v. Magnolia Petroleum Co.*, 378 Ill. 19, 28, 37 N.E.2d 760 (1941).

The party wishing to reform a contract must show mutual mistake by clear and convincing evidence, and a trial court's decision on the matter will not be disturbed unless it is against the manifest weight of the evidence. *Fisher v. State Bank of Annawan*, 163 Ill. 2d 177, 182, 643 N.E.2d 811, 814 (1994).

■ To state a cause of action for reformation of a contract, the plaintiff must assert: (1) the existence and substance of an agreement between the parties and the identity of the parties to the agreement; (2) that the parties agreed to reduce their agreement to writing; (3) the substance of the written agreement; (4) that a variance exists between the parties' original agreement and the writing; and (5) mutual mistake or some other basis for reformation. *Schaffner v. 514 West Grant Place Condominium Ass'n*, 324 Ill. App. 3d 1033, 1044, 756 N.E.2d 854, 864 (2001).

As to the first factor, the CTA argues that no agreement exists between the relevant parties, meaning Schivarelli and the CTA, because the utilities/vestibule agreement was made with Kotin, but never presented to the Board.

The Metropolitan Transit Authority Act (70 ILCS 3605/1 *et seq.* (West 1998)) created the CTA as a municipal corporation that acts through ordinances passed by the Board. 70 ILCS 3605/3, 31 (West 1998). The CTA has the authority to enter into lease agreements through its governing and administrative body, the Board. 70 ILCS 3605/8, 19 (West 1998).

In this case, the CTA was the lessor in the lease agreement with Schivarelli, and the Board's approval was required to enter into the lease. However, no evidence exists in the record that the Board's approval was sought, let alone given, for the utilities/vestibule agreement. The evidence shows an agreement that was negotiated between Kotin as an agent of the CTA and Schivarelli. This negotiated agreement was not sufficient to bind the CTA because Kotin did not have

this authority. The CTA is not obligated to adhere to an agreement its governing body did not approve.

■ In a contract implied in fact, a contractual duty is imposed by reason of a promissory expression inferred from facts, circumstances and expressions by the promissor showing an intent to be bound. *South Suburban Safeway Lines, Inc. v. Regional Transportation Authority*, 166 Ill. App. 3d 361, 365-66, 519 N.E.2d 1005, 1008 (1988). Such contract may be proved by circumstances showing that the parties intended to contract and by the general course of dealing between them. However, there can be no promise implied where the relation between the parties excludes the inference that they were dealing on a footing of contract. *South Suburban*, 166 Ill. App. 3d at 366, 519 N.E.2d at 1008. A municipality cannot be obligated to honor an alleged implied contract which is *ultra vires*, contrary to statutes or charter provisions, or contrary to public policy. *Lindahl v. City of Des Plaines*, 210 Ill. App. 3d 281, 290, 568 N.E.2d 1306, 1312 (1991), quoting *South Suburban*, 166 Ill. App. 3d at 366, 519 N.E.2d at 1008. The Illinois Supreme Court has held that a person dealing with a municipal corporation is charged with the knowledge of the limitations of the power of that corporation for any contract attempted to be entered into by any of its officials. *May v. City of Chicago*, 222 Ill. 595, 599-600, 78 N.E. 912, 913 (1906). Accordingly, a CTA employee cannot act in such a capacity as to form a contract without the approval of the Board.

■ Here, Kotin admitted several times during his trial testimony that the utilities/vestibule agreement needed to be approved by the Board and that he could not orally change the terms of the lease. These statements were supported by the testimony of Cardilli. Plaintiffs have offered no evidence to show that the Board consented to the utilities/vestibule agreement. Consequently, the agreement between Schivarelli and Kotin was not binding on the CTA. Therefore, no agreement existed between the relevant parties to the lease agreement.

Next, the CTA contends that plaintiffs failed to prove by clear and convincing evidence that Schivarelli and Kotin agreed to reduce the utilities/vestibule agreement to writing. We agree. " 'The province of reformation is to make a writing express the bargain which the parties desired to put in writing. [Citation.] Agreements of which they did not desire written expression will not be put into writing by decree of the court. (Emphasis omitted.)' " *Aetna Screw Products Co. v. Borg*, 116 Ill. App. 3d 206, 212, 451 N.E.2d 1260, 1264 (1983), quoting 13 Williston on Contracts § 1549, at 132 (W. Jaeger 3d ed. 1970).

Schivarelli testified that the purpose of the August 1985 amended

lease agreement was to create options to renew for additional five-year terms. He did not intend to include the utilities/vestibule agreement in the amended lease because the utility issue had been resolved and he was not receiving any utility bills. Schivarelli's testimony suggested that his agreement with Kotin was oral in nature and not planned to be part of the lease agreement. The trial court should not have found that the parties intended to reduce the utilities/vestibule to writing when the testimony of Schivarelli indicated otherwise.

Plaintiffs did not prove their right to reformation when the evidence at trial failed to show that the utilities/vestibule agreement was approved by the Board, as the lessor, and that the parties agreed to reduce this agreement to writing. The trial court's findings to the contrary are against the manifest weight of the evidence. Consequently, we reverse the trial court's reformation of the August 1985 lease agreement.

## Affirmative Defenses

■ We next address plaintiffs' assertion of several affirmative defenses as alternatives if this court were to reverse the trial court's decision to reform the lease.

Plaintiffs contend that the CTA has waived its right to enforce section 3(a) of the August 1985 lease because it knowingly failed to enforce the utility provision for 14 years.

Plaintiff contends that "any act of a landlord that affirms the existence of a lease and recognizes a tenant as his lessee, *after the landlord had knowledge of a breach of the lease,* results in the landlord waiving his right to a forfeiture of the lease." (Emphasis added.) *McGill v. Wire Sales Co.,* 175 Ill. App. 3d 56, 59, 529 N.E.2d 682, 684 (1988).

While the CTA did accept rent from plaintiffs even though plaintiffs were not paying for their utility service, the finding in *McGill* is distinguishable from the present case. The key is the knowledge of the lessor, the CTA. The CTA is a municipal agency acting as a landlord in the instant case and nothing in the record would support imputing knowledge to the Board, as the governing body of the CTA. Here, the evidence shows that the Board did not have knowledge that the CTA was paying the utilities for plaintiffs until 1997. Plaintiffs assert that the fact that they did not receive utility bills or notices of default prior to 1997 indicates that the CTA was aware of their nonpayment of utility expenses. The record does not support this bare contention of inferred knowledge based solely on lack of receipt of utility bills.

Plaintiffs also submitted two internal CTA memoranda discussing excessive water usage at the Fullerton Avenue station and suggestions to inquire as to usage by tenants. These memos are not sufficient to

impute knowledge to the Board that they knowingly waived their right to enforce the lease as written.

For waiver to apply, the lessor must have knowingly waived adherence to the provision and the evidence simply does not show that the Board had knowledge that plaintiffs breached the lease by failing to pay the utility bills.

Plaintiffs also raise the affirmative defense of *laches*. The general rule is that the defense of *laches* may not be asserted against the state or its county or municipal subdivisions in actions involving public rights. Where a governmental body is engaged in a matter involving the exercise of its governmental functions, the defense of *laches* is not favored and should only be invoked in extraordinary circumstances. *County of Cook v. Chicago Magnet Wire Corp.*, 152 Ill. App. 3d 726, 728, 504 N.E.2d 904, 905 (1987). Here, plaintiffs failed to assert any extraordinary circumstances that would give rise to the defense of *laches* when the evidence shows the Board was unaware that the CTA had mistakenly paid the plaintiffs' utility bills.

Additionally, plaintiffs asserted estoppel as an affirmative defense. To invoke equitable estoppel against a municipality there must be an affirmative act on the part of the municipality and the inducement of substantial reliance by the affirmative act. *Hamwi v. Zollar*, 299 Ill. App. 3d 1088, 1095, 702 N.E.2d 593, 598 (1998). The affirmative act that prompts a party's reliance must be an act of the public body itself such as a legislative enactment rather than the unauthorized acts of a ministerial officer or a ministerial misinterpretation. *Hamwi*, 299 Ill. App. 3d at 1095. In this case, estoppel cannot be applied because the evidence failed to show an affirmative act of the Board. The affirmative act alleged by plaintiffs was that of Kotin, who admittedly acted without Board approval.

The final affirmative defense maintained by plaintiffs was unclean hands. The application of the unclean hands doctrine has not been favored by the courts. *Jaffe Commercial Finance Co. v. Harris*, 119 Ill. App. 3d 136, 140, 456 N.E.2d 224 (1983). The doctrine prohibits "one seeking equity [from] tak[ing] advantage of his own wrong." *Jaffe*, 119 Ill. App. 3d at 140. In determining whether a party acted with unclean hands, the court will look to the intent of the party, not the effect of its actions, and will only find unclean hands present if there has been fraud or bad faith. *La Salle National Bank v. 53rd-Ellis Currency Exchange, Inc.*, 249 Ill. App. 3d 415, 437-38, 618 N.E.2d 1103, 1119 (1993). Here, plaintiff failed to present any evidence at trial to show any intent of fraud or bad faith on the part of the CTA, and accordingly, plaintiffs' affirmative defense of unclean hands must fail.

## III. CONCLUSION

For the foregoing reasons, we reverse the decision of the circuit court of Cook County and remand for the trial court to determine the amount of money owed by plaintiffs to the CTA for the cost of utilities for the period 1983 to 1997.

Reversed and remanded.

REID, P.J., and CAMPBELL, J., concur.