# Illinois Official Reports

## Appellate Court

---

### *Ivancicts v. Griffith*, 2017 IL App (4th) 170028

---

| | |
|---|---|
| Appellate Court Caption | DAWN IVANCICTS, Plaintiff-Appellee, v. MICKEY GRIFFITH, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-17-0028 |
| Filed | November 21, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Livingston County, No. 2016-OP-1; the Hon. Robert M. Travers, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Kevin C. Sanborn and Brendan D. Bukalski, of Johnson Law Group, LLC, of Bloomington, for appellant.<br><br>Vincent A. Tessitore, of Lindell & Tessitore, P.C., of Naperville, for appellee. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Harris and DeArmond concurred in the judgment and opinion. |

**OPINION**

¶ 1    In January 2016, petitioner, Dawn Ivancicts, filed a petition for a stalking no contact order against respondent, Mickey Griffith, pursuant to the Stalking No Contact Order Act (Act) (740 ILCS 21/1 *et seq.* (West 2016)). In September 2016, the trial court entered a plenary stalking no contact order against Griffith. In October 2016, Griffith filed a motion to vacate judgment, arguing that the unclean-hands doctrine should have barred the court from entering the order. The trial court declined to apply the unclean-hands doctrine and denied Griffith's motion to vacate judgment.

¶ 2    On appeal, Griffith argues that (1) the doctrine of unclean hands applies to petitions brought pursuant to the Act and (2) the trial court erred by failing to apply the unclean-hands doctrine in his case. We conclude that (1) the doctrine of unclean hands does not apply to the Act and, even if it did, (2) the trial court properly rejected its application on this record.

¶ 3                                    I. BACKGROUND

¶ 4    This case involves a dispute between two neighbors. In January 2016, Dawn filed a verified petition for a stalking no contact order against Griffith. The trial court denied Dawn's request for an emergency order and set the petition for a plenary hearing.

¶ 5    In July and September 2016, the trial court conducted hearings on the petition. Dawn's husband, Jeff Ivancicts, testified that Dawn and he were neighbors with Griffith and that Griffith had an easement over their property. Jeff stated that they got along well with Griffith until a lawsuit involving Griffith and the easement was filed in 2014. Thereafter, Griffith yelled obscenities at Dawn and mocked her on multiple occasions. Specifically, Jeff testified about an incident in September 2015 when he and Dawn were outside their home and Griffith yelled at Dawn that she was "a f*** fat b***" and Griffith then made cow or pig sounds to emphasize the point. He also then accused her of being involved in killing her mother-in-law. Griffith has also turned his stereo up to loudly play music and then pointed it at the residence of Jeff and Dawn.

¶ 6    Jeff testified that Griffith repeatedly engaged in yelling, playing his music very loud, and swearing at Dawn. Jeff said that during these incidents Griffith sounded intoxicated and acted intoxicated.

¶ 7    Jeff also testified about an incident in April 2015. When after he returned from work one evening, he and Dawn saw Griffith walking in front of their house. Griffith yelled at them that he was going to bulldoze their garage, bulldoze their shed, and was going to own their property. He also yelled that Dawn "was a b***," and he again yelled that Dawn let her mother-in-law die.

¶ 8    Jeff emphasized that Griffith's mistreatment of Dawn "happens every day or every other day; it's continuous." He said it has reached the point where Dawn will not go out of the house until Jeff gets home from work because she is afraid of Griffith, who was now at his home during the day. Jeff explained that Dawn has "been a nervous wreck" and is "on medication for her nerves. She's constantly crying and upset."

¶ 9    Dawn testified, essentially corroborating Jeff's testimony. She said that Griffith had yelled obscenities at her on multiple occasions during 2015 and 2016. One of the insults that Griffith yelled at Dawn is that she killed her mother-in-law for money. She also testified that

in April 2016, she discovered Griffith looking through her kitchen window as Dawn sat down to eat. Griffith's conduct has caused her severe emotional and physical distress and has altered her daily routine. She said he has constantly called her names—like "baboon" and "you're a fat ugly b***"—and then he would bring his chair out to a place on his property where he could sit and stare at her. Dawn testified that Griffith's conduct has created stress for her and required her to take medication under a doctor's care.

¶ 10 Griffith testified and acknowledged that he has yelled at Dawn and did accelerate his vehicle quickly outside her home. He complained that Dawn constantly video-recorded him with her cell phone and that she had video cameras pointed at the easement. Griffith also testified that Dawn constantly blocked the easement and that they were currently involved in litigation over it. Griffith argued that his actions were a justified response to Dawn's provocations.

¶ 11 During closing arguments, Dawn argued that she was a victim of stalking and sought imposition of a two-year stalking no contact order as well as attorney fees. Griffith argued that both parties engaged in routine harassment of each other and asked the court to deny imposition of the stalking no contact order. Griffith argued that the Act was not designed to protect stalking victims who had also engaged in misconduct.

¶ 12 At the conclusion of the September 2016 hearing, the trial court granted Dawn's petition for a stalking no contact order against Griffith. The court found that Dawn had been the victim of stalking and that she had suffered emotional distress as a result. The court explained its ruling, in pertinent part, as follows:

"[W]e have overwhelming proof here that certain incidents *** have occurred, that they have certainly caused emotional distress, that they did not happen for any good reason other than just pure meanness; and we've been talking about them for an extended period of time.

***

*** And I am finding, and this is not a difficult finding, that the petitioner is the victim of two of or more acts of threatening or monitoring and that this has been done by the respondent on a regular basis for about the last year and a half to two years.

Moreover, the [c]ourt has every reason to believe the conduct will continue unless prohibited by a stalking no contact order. I'm sure no one in this courtroom would want to bet that, if I let these people out of this courtroom without any restrictions on their activity, that they wouldn't be at each other's throats tonight. So, no question that this would continue if in fact no relief was granted.

As I suggested, it has caused emotional distress. We've heard that testimony offered; it's certainly credible.

*** I find that [Dawn's] reactions are not the reactions of an unreasonable person. I believe that she is acting reasonabl[y] in reacting the way that she has to these particular events.

I'm not going to go over the individual events, the name-calling. I mean, there's adequate proof of that. As a matter of fact, there's been enough incidents admitted that we don't need to go into it. And we aren't talking about minor exchanges."

¶ 13 The trial court ordered that the stalking no contact order would be for two years and that it could be extended past that period.

¶ 14    In October 2016, Griffith filed a motion to vacate judgment under section 2-1203 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1203 (West 2016)), arguing that the unclean-hands doctrine should have barred the court from entering the order. Griffith asserted that under that doctrine, a party must have clean hands to obtain relief. In that motion, Griffith argued the following:

> "[I]t defies all principals [*sic*] of law that a person who caused the action should benefit from the action or be allowed to be protected by a no contact order. As pointed out in other areas of law under either the [u]nclean [h]ands doctrine or [s]elf-defense theory[,] a person cannot be held liable due to the wrongdoing of another. Respondent likewise should not be held responsible due to the harassment he suffered from [p]etitioner that caused the actions the Court found to qualify for granting [p]etitioner's request for a [s]talking [n]o [c]ontact [o]rder."

¶ 15    In November 2016, the trial court conducted a hearing on Griffith's motion to vacate judgment and denied it. The court determined that there was a basis for the order and declined to apply the unclean-hands doctrine, explaining as follows:

> "[W]hat happens if I don't enter a stalking no-contact order here? I just say, you know what, a plague on both your houses, you're both at fault here, I'm not going to do anything to help you. So, what do we read about the next week? Dead people, okay, crimes, unhappy people. It doesn't take a lot of imagination to figure out what's going to happen if the Court says I'm not going to do anything, you can just go ahead and provoke each other, you know, without limit until you get to the point where there's a real crime that they're going to prosecute you on. No, that would be even more ridiculous for the Court to engage in than if I simply said, well, you've got to be perfect before I can provide any protection. And if we look at what I think this Act was designed for[,] *** it just makes even less sense.

> * * *

> But the crux of it is at this particular point, there is a basis for entry of the stalking no contact order. It's well supported by the facts in this particular matter. The testimony was ample in relation to *** the findings of the court; and the motion to reconsider is denied."

¶ 16    After denying Griffith's motion to vacate judgment, the trial court granted Dawn's petition for attorney fees and awarded her $3500. This appeal followed.

¶ 17                                    II. ANALYSIS

¶ 18    Griffith argues that (1) the doctrine of unclean hands applies to petitions brought pursuant to the Act and (2) the trial court erred by failing to apply the unclean-hands doctrine in his case. We conclude that (1) the unclean-hands doctrine does not apply to the Act and, even if it did, (2) the trial court properly rejected its application on the record before us.

¶ 19                                    A. Unclean Hands

¶ 20    Griffith argues that the doctrine of unclean hands applies to petitions brought pursuant to the Act. We disagree.

¶ 21    The Act is silent as to whether the doctrine of unclean hands applies (see 740 ILCS 21/1 (West 2016)), although we note that section 30(a) of the Act provides that proceedings to

obtain, modify, or appeal a stalking no contact order "shall be governed by the rules of civil procedure of this State." 740 ILCS 21/30(a) (West 2016). Section 2-613 of the Code provides that defendants may plead as many defenses or counterclaims as they are entitled to under law. 735 ILCS 5/2-613(a) (West 2016). One such defense under Illinois law is the equitable defense of unclean hands. See *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 60, 922 N.E.2d 380, 416-17 (2009). The doctrine of unclean hands bars equitable relief, such as an injunction, when the plaintiff is guilty of misconduct in connection with the subject matter of the litigation. *Id.* Thus, Griffith argues that a supposed victim of stalking with unclean hands, as he contends is the situation in this case, should not be eligible to receive a stalking no contact order. We disagree because we conclude that all alleged victims of stalking should be eligible to receive a stalking no contact order.

¶ 22        Section 5 of the Act explicitly states that one of its purposes is that "[a]ll stalking victims should be able to seek a civil remedy requiring the offenders stay away from the victims and third parties." 740 ILCS 21/5 (West 2016). Section 10 of the Act defines stalking as "engaging in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to fear for his or her safety or the safety of a third person or suffer emotional distress." 740 ILCS 21/10 (West 2016). Section 80(a) provides that "[i]f the court finds that the petitioner has been a victim of stalking, a stalking no contact order *shall issue*" (emphasis added). 740 ILCS 21/80(a) (West 2016). The Act contains no requirement or even a suggestion that a victim of stalking must have "clean hands" to receive a stalking no contact order, providing instead that *all* stalking victims are entitled to no contact orders. We conclude that the purpose of the Act is therefore to protect *all* stalking victims, not just "innocent" victims.

¶ 23        This interpretation of the Act is consistent with our view that one of the Act's goals is to protect victims of stalking who are otherwise not protected by other civil and criminal laws. For example, the Illinois Domestic Violence Act of 1986 allows for the issuance of a civil order of protection for persons in a dangerous dating or familial relationship (see 750 ILCS 60/201(a) (West 2016)), and section 213 of the Civil No Contact Order Act provides that civil no contact orders are also available for victims of sexual assault. See 740 ILCS 22/213 (West 2016). However, these specialized laws do not protect all victims of stalking.

¶ 24        Before the Act's enactment, the criminal definition of stalking was narrow and often would not apply unless direct threats were made to the victim. See 720 ILCS 5/12-7.3 (West 2008). The Legislature enacted the Act to address these shortcomings. See 740 ILCS 21/5 (West 2016); see also Lori G. Levin, *Stalking No Contact Order Act*, The Catalyst (Standing Comm. on Women & the Law, Ill. State Bar Ass'n, Springfield, Ill.), Nov. 2011, at 9. The Act's goal of protecting all stalking victims would be thwarted if the conduct of the alleged victim were a justification for denying protection.

¶ 25        In support of this conclusion, we note that the unclean-hands doctrine has generally not been favored by the courts. As explained by the First District Appellate Court in *Jaffe Commercial Finance Co. v. Harris*, 119 Ill. App. 3d 136, 140, 456 N.E.2d 224, 228 (1983),

> "[t]raditionally, the unclean[-]hands doctrine has not been favored by the courts, for it is not a judicial straightjacket intended to prevent equity from doing complete justice. [Citations.] Furthermore, Illinois decisional law provides that the misconduct on the part of a plaintiff which will defeat recovery in a court of equity under this rule must

have been fraud or bad faith directed toward the defendant in the very transaction being considered." (Internal quotation marks omitted.)

The Fifth District Appellate Court reached a similar conclusion three years after *Jaffe* when, in *Paul L. Pratt, P.C. v. Blunt*, 140 Ill. App. 3d 512, 521-22, 488 N.E.2d 1062, 1069 (1986), that court wrote the following:

"In Illinois, misconduct on the part of a plaintiff that will defeat recovery in a court of equity under the doctrine of unclean hands must have been conduct in connection with the very transaction being considered or complained of and must have been misconduct, fraud[,] or bad faith toward the defendant making the contention. [Citation.] The doctrine is not a judicial strait-jacket that will prevent a court of equity from doing justice and its application is not favored by the courts."

See also *La Salle National Bank v. 53rd-Ellis Currency Exchange, Inc.*, 249 Ill. App. 3d 415, 437, 618 N.E.2d 1103, 1119 (1993) (citing *Jaffe* favorably and holding that "[t]he invocation of the doctrine of unclean hands is within the trial court's discretion[,] and its application has not been favored by the courts"); *Zahl v. Krupa*, 365 Ill. App. 3d 653, 658, 850 N.E.2d 304, 310 (2006) (Second District Appellate Court held that the doctrine of clean hands applies if a party seeking equitable relief "is guilty of misconduct, fraud, or bad faith toward the party against whom relief is sought and if that misconduct is connected with the transaction at issue in the litigation"). More recently in *Gambino*, the First District Appellate Court reiterated that for the unclean-hands doctrine to apply, "the party's misconduct must rise to the level of fraud or bad faith." *Gambino*, 398 Ill. App. 3d at 60, 922 N.E.2d at 417 (2009).

¶ 26    For the reasons stated, we conclude that the unclean-hands doctrine is unavailable as a defense to a petition for a stalking no contact order brought pursuant to the Act.

¶ 27                                    B. This Case

¶ 28    Even if the unclean-hands doctrine applied to petitions brought pursuant to the Act, the trial court properly rejected its application on this record. As the First District Appellate Court held in *Jaffe* and *La Salle National Bank*, two cases cited earlier, the application of the unclean-hands doctrine lies within the sound discretion of the trial court. *Jaffe*, 119 Ill. App. 3d at 140, 456 N.E.2d at 228; *La Salle National Bank*, 249 Ill. App. 3d at 437, 618 N.E.2d at 1119. See also *Eichmann v. National Hospital & Health Care Services, Inc.*, 308 Ill. App. 3d 337, 341, 719 N.E.2d 1141, 1145 (1999) ("[i]t is within the sound discretion of the trial court whether to apply the doctrine of unclean hands"); *Mascenic v. Anderson*, 53 Ill. App. 3d 971, 972, 369 N.E.2d 172, 173 (1977) ("[t]he 'clean hands' doctrine is not a judicial straightjacket, is not favored by the courts, is not intended to prevent equity from doing complete justice, and its application is a matter for the sound discretion of the trial court"). This court cited *Mascenic* approvingly and adopted the above quote from that case in *Key v. Key*, 111 Ill. App. 3d 151, 158, 443 N.E.2d 812, 817 (1982).

¶ 29    Thus, even if the unclean-hands doctrine applied to the proceedings in this case, the record compellingly demonstrates that the trial court both considered that doctrine and rejected it. We earlier quoted a portion of what the trial court said in rejecting Griffith's motion to vacate judgment, in which the court explained why it would not apply the unclean-hands doctrine, and we deem the trial court's reasoning very sound, far short of anything that could constitute an abuse of its discretion.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.