NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200645-U

NOS. 4-20-0645, 4-20-0646 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 6, 2022
Carla Bender
4ᵗʰ District Appellate
Court, IL

| | | |
|---|---|---|
| DEBORAH EWING, | ) | Appeal from the |
|      Petitioner-Appellee, | ) | Circuit Court of |
|      v. | ) | Livingston County |
| TRENA GAGLIARDO and | ) | Nos. 20OP118 |
| MELANIE GAGLIARDO, | ) | 20OP119 |
|      Respondents-Appellants. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Robert M. Travers, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Knecht and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, finding the trial court did not err in determining respondents could not raise a defense under the unclean-hands doctrine, the trial court did not err in judging witness credibility and weighing the evidence, and the judgment does not stand against the manifest weight of the evidence.

¶ 2   Petitioner, Deborah Ewing, filed a verified petition for a stalking no contact order, alleging respondents, Trena and Melanie Gagliardo, harassed her and her daughter through vulgar language, obscene gestures, yelling, banging on her door, telling men to go to the Ewing house, and placing signs claiming Ewing spied on them and calling Ewing vulgar names. The trial court granted an emergency stalking no contact order, protecting Ewing and her daughter. The Gagliardos, meanwhile, attempted to file answers and counterclaims but were not allowed to

do so. Over the course of a three-day hearing, the trial court heard evidence from all parties and eventually entered a plenary stalking no contact order against the Gagliardos, who appealed.

¶ 3        On our own motion, this court consolidated the two cases into this one appeal. On appeal, the Gagliardos levy two arguments: first, the trial court erred, as a matter of law, by not allowing their defense of unclean hands; and second, the trial court abused its discretion "by not considering [the Gagliardos'] testimony regarding the stalking behavior they suffered from [Ewing]" and issuing the plenary stalking no contact order. We disagree and affirm the trial court's judgment.

¶ 4        I. BACKGROUND

¶ 5        The parties have been next-door neighbors since 2018. They initially got along, but the relationship soured a year later and then further deteriorated. On August 3, 2020, Ewing filed a verified petition for a stalking no contact order against her neighbors, the Gagliardos, alleging they harassed her and her daughter. The trial court granted an emergency order that same day and set the matter for hearing. Meanwhile, the Gagliardos attempted to file a counterpetition for a stalking no contact order against Ewing along with an answer invoking affirmative defenses to Ewing's petition; however, they were told to address those requests with the trial court during the hearing.

¶ 6        On August 19, 2020, the parties appeared for a hearing on Ewing's petition. The Gagliardos informed the trial court they had tried to file an "answer *** complaint and counterclaims." This colloquy followed:

         "THE COURT: What's the nature of your counterclaim?

TRENA GAGLIARDO: That Debbie's been engaging in stalking; that Debbie has, has committed eavesdropping; and that Debbie has committed unauthorized video recording.

THE COURT: Okay. The statute itself does not allow the filing of counterclaims. All right? You can discuss this if you wish when she testifies, if she testifies; but there's no requirement that you have to file those as pleadings in this particular case. As a matter of fact, I doubt you can file them.

TRENA GAGLIARDO: Okay. But I can address these?

THE COURT: I think you'd be able to address them in some fashion. I'm not going to guarantee that, all right, it depends on the proof. I have not heard any of the proof yet."

Once the hearing proceeded to the evidence, Ewing testified Melanie Gagliardo harassed Ewing's daughter at school and "[t]he school had to intervene and put a no-contact clause in their files." She described the Gagliardos' behavior as "[c]onstant cussing and yelling at me and my daughter." Ewing claimed her daughter no longer went outside due to fear of hearing barbs from the Gagliardos like, "your mother's a whore so that makes you a whore too and you need to go to hell." She also stated she had previously called the police "because Trena was banging on my door and cussing at my daughter while I'm at work." Ewing testified this behavior prompted her to install security cameras around her house in order to protect her daughter.

¶ 7 Ewing testified Trena harassed her in various ways too, including: "threatening to have men at my house," throwing a rock at Ewing, shining car headlights at her, following Ewing partway to work, calling her landlady to tell her to control Ewing, and putting up yard signs calling Ewing vulgar names and claiming Ewing is a window peeper. Ewing recalled the

harassment cooled over the winter months but reignited over Memorial Day 2020 when the parties argued and the Gagliardos began "cussing and yelling" at her. As for Melanie, Ewing testified she has yelled at her, she fixes the derogatory yard signs when the wind or rain knock them down, and she participated in the "big argument" on Memorial Day by yelling and cussing.

¶ 8 Ewing presented five photographs as exhibits. Three pictures showed the signs the Gagliardos placed in their yard, disparaging Ewing. One picture showed Trena shining her headlights into Ewing's home at 3:30 or 4:30 am. The final picture showed Trena giving the finger to Ewing and the camera, which Ewing claimed, "happened several times."

¶ 9 Besides testifying themselves, the Gagliardos called as witnesses Officer Matthew Cavanaugh of the Chatsworth Police Department and their neighbor, Paula Griffin. Without providing any details, Cavanaugh testified he was aware of something happening between Melanie and Ewing's daughter at school but he labeled it a "she-said, she-said" situation and the school "took care of it." Cavanaugh recalled responding to the Gagliardos' home when they complained about Ewing's lights. He did not issue a police report, calling it a civil matter. Through Cavanaugh's testimony, the Gagliardos admitted photographs of the lights on Ewing's home. Cavanaugh noted he responded to either Ewing's or the Gagliardos' homes over time but could not recall the details. He did remember he had never filed a police report.

¶ 10 Griffin testified she lived next door to the Ewings and she got along with them when they first moved to the neighborhood. However, she claimed she stopped using her front porch when Ewing installed cameras around the house. She said she witnessed Ewing harassing the Gagliardos by pounding on Melanie Gagliardo's bedroom window and yelling and cursing at Trena Gagliardo. Because the allotted time for the hearing expired, the trial court continued the emergency order of protection through the next hearing date.

¶ 11     On October 1, 2020, the parties reassembled for the continued hearing. Melanie Gagliardo testified next. She confirmed she was 18 years old and lived with her parents next door to Ewing. Melanie noted the Ewings moved next door in summer 2018 and the families initially had no problems with each other. She stated the relationship changed for the worse in fall 2019, when Trena put up a string-fence between their houses. Melanie testified Ewing would come over uninvited or listen to the Gagliardos' conversations when guests visited their house.

¶ 12     Melanie stated she tried being friends with Ewing's daughter but she stopped trying because Ewing's daughter became "clingy" and "disrespectful." Melanie denied harassing Ewing's daughter and claimed the opposite was true—she was the one being harassed. She likewise refuted Ewing's claim that the school put a note in her official record about staying away from Ewing's daughter. She denied ever threatening Ewing or her daughter and denied hearing Trena ever threaten the Ewings. Melanie testified Ewing beat on her bedroom window, Ewing followed her to an appointment and then through a Walmart, Ewing berated her, and she witnessed Ewing cussing and yelling at Trena. Melanie noted her boyfriend died in a car accident and Ewing and her daughter have both said Melanie should have died rather than the boyfriend.

¶ 13     According to Melanie, Ewing started the argument on Memorial Day when she began yelling at Trena. Melanie acknowledged she joined the argument to defend her mother. She likewise acknowledged she helped her mother place the disparaging signs in their yard, though she claimed the pictures of the signs Ewing introduced did not show the final version of the signage. Through Melanie's testimony, the Gagliardos introduced photographs showing their yard signs, a "monster" they placed in their yard that they claimed the signs described, and the lights and cameras on the Ewing home. On direct examination, Melanie testified she overheard a conversation between her mother and two men who stopped to read their yard signs where

someone called Ewing a "whore," and told the men they should visit her, but she maintained Trena did not say anything to Ewing's face and there were no threats. On examination by the trial court, however, Melanie said Trena did not call Ewing a "whore" but told the two men Ewing "acte[ed] like a whore." Melanie denied her mother told the men to go see Ewing.

¶ 14 Trena Gagliardo testified next. She denied following Ewing to work and denied calling her landlord. She likewise denied yelling or cursing at Ewing, claiming she had not talked to Ewing since September or October 2019, when she asked Ewing to keep her trash out of the Gagliardos' yard. She too noted her family got along with Ewing when the Ewings moved in, but she testified Ewing constantly came over uninvited and would not leave. Trena also stated Ewing would eavesdrop on the Gagliardos' conversations. She testified her family tried to avoid Ewing.

¶ 15 As for the Memorial Day argument, Trena testified she politely asked Ewing to pick up her trash when Ewing began yelling and cussing at her. She denied calling Ewing any vulgar names. Trena noted Melanie joined the argument and Ewing told her to die. Trena claimed she tried to retreat from the argument but Ewing followed her. Trena acknowledged she gave the middle finger to Ewing's camera, but she denied aiming the gesture at Ewing. The trial court interrupted Trena's testimony because the allotted time for the hearing expired. It maintained the emergency stalking no contact orders against the Gagliardos and continued the matter yet again.

¶ 16 On November 20, 2020, the parties reconvened, and Trena continued her testimony. She acknowledged talking to two men about the signs in her yard, but she denied sending them to Ewing's home. Trena testified she observed Ewing peeking through her family's windows and into their vehicles. She stated Ewing beat on her windows. Trena complained about

Ewing's lights and cameras and claimed they caused her and Melanie a lot of distress. She testified other neighbors had obtained restraining orders against Ewing.

¶ 17    Trena again asked to file "answers, complaints, and affirmative defenses" against Ewing's petition. She said she tried twice to file them with the clerk but was told she "couldn't file them because of the order." The trial court had her mark them as exhibits and accepted them. Trena clarified the documents were "my pleadings, my answers, my counterclaim, and my affirmative defenses." She also submitted additional exhibits, namely more photographs showing Ewing's lights and cameras.

¶ 18    In closing, Ewing argued the Gagliardos' harassment of her will continue without a protection order. She said she believed she proved her case while the Gagliardos failed to prove she did any of the misconduct they alleged. The Gagliardos argued Ewing presented hearsay evidence. They maintained they merely put up a string fence, politely asked Ewing to keep trash out of their yard, and avoided Ewing, but she kept harassing them. They argued Ewing's behavior of following them, peeking in their windows, and installing cameras and lights violated several Illinois laws related to stalking, disorderly conduct, unauthorized video recording, and eavesdropping. The Gagliardos denied harassing Ewing and claimed they always walked away when Ewing confronted them. Despite their denials, they argued the following:

> "Talking about somebody, we have a right to sit in our yard and talk about somebody. That's protected speech. We have a right to post signs in our yard to tell people what is going on, to address problems when police don't enforce laws. We have a right to voice our opinion, and we have a right to put slang words down as long as they aren't going to cause a public disturbance or threaten violence. ***

These are all constitutional[ly] protected laws, just like flipping the bird. *** and I do point out that when I flipped the bird that was in June ***. Then flipping the bird is protected speech because it shows when you are angry or you are disapproving of something; and the constitution especially, especially protects it because it's expressive speech. Just like my sign that says banderslut, just like this other sign that says snagglec***, it's protected speech. It is artistic in my eye; and whether it's artistic in [Ewing's] eye, it may be two different things; but it's my artistic expression. My sign saying Ewing sucks is no different than everybody's signs in their yards right now saying Pritzker sucks. No different. And to look at any one of those things without looking at them under the constitution is wrong."

¶ 19    The trial court announced its ruling immediately and rejected the Gagliardos' argument their speech and behavior was constitutionally protected. The trial court likewise noted none of the Gagliardos' complaints or defenses were sufficient, explaining: "There's a multitude of affirmative defenses that you have filed, none of which apply in this particular instance." Addressing the Gagliardos directly, the court said: "Let's focus on your behavior. Okay? You are saying, okay, I did this stuff; but I can do that because she was bad or she's got a light up that shines in my room or her camera lens up may see something in my home." The trial court dismissed their reasoning. Ultimately, the court found Ewing proved the allegations in the petition by a preponderance of the evidence and determined "it is appropriate for stalking no contact orders to be entered against both the Respondents in this particular proceeding." It entered plenary stalking no contact orders against the Gagliardos and protecting Ewing and her daughter that same day.

¶ 20    This appeal followed.

¶ 21    The Gagliardos challenge the trial court's judgment on two grounds, alleging: (1) the trial court erred in not allowing their affirmative defense based on the unclean-hands doctrine and (2) the trial court abused its discretion in issuing the stalking no contact order, specifically by failing to consider their testimony about Ewing's harassing behavior toward them. We take each challenge in turn.

¶ 22    II. ANALYSIS

¶ 23    The Gagliardos contend the trial court's decision to refuse their unclean-hands defense led to what they term a "clearly unjust result." They maintain they have suffered harassment from Ewing and the Stalking No Contact Order Act's (Act) (740 ILCS 21/1 *et seq.* (West 2020)) prohibition on mutual no stalking orders combined with the case law rejecting the unclean-hands defense in these cases result in them being denied legal redress or even protection from Ewing. The Gagliardos rightly acknowledge they cannot receive a reciprocal stalking no contact order against Ewing because the Act provides: "Mutual stalking no contact orders are prohibited. Correlative separate orders undermine the purposes of this Act." 740 ILCS 21/85 (West 2020). Up against this statutory bulwark, they pivot their attack to the unclean-hands doctrine, arguing it should be applicable in cases like theirs. The Gagliardos direct our attention to a "district split" between our opinion in *Ivancicts v. Griffith*, 2017 IL App (4th) 170028, ¶ 26, 90 N.E.3d 641, where we held "that the unclean-hands doctrine is unavailable as a defense to a petition for a stalking no contact order brought pursuant to the Act," and the Second District's order in *Munoz v. Fritsche*, 2014 IL App (2d) 130359-U, where the court allowed a respondent to invoke the unclean-hands doctrine in defense of a petition for a stalking no contact order under

the Act. They ask us "to reverse [our] holding in *Ivancicts* and allow the defense of Unclean Hands." We see no reason to depart from our precedent.

¶ 24 In *Ivancicts*, coincidentally a case that came to us from the same trial court as this case, we considered whether "the doctrine of unclean hands applies to petitions brought pursuant to the Act." *Ivancicts*, 2017 IL App (4th) 170028, ¶ 20. We took a comprehensive approach, considering the Act's purpose and other provisions *vis-à-vis* the unclean-hands doctrine. We observed, by and large, the unclean-hands defense "bars equitable relief, such as an injunction, when the plaintiff is guilty of misconduct in connection with the subject matter of the litigation." *Ivancicts*, 2017 IL App (4th) 170028, ¶ 21. We further "note[d] that the unclean-hands doctrine has generally not been favored by the courts." *Ivancicts*, 2017 IL App (4th) 170028, ¶ 25.

¶ 25 Turning our attention to the Act, we observed it "contains no requirement *or even a suggestion* that a victim of stalking must have 'clean hands' to receive a stalking no contact order." (Emphasis added.) *Ivancicts*, 2017 IL App (4th) 170028, ¶ 22. We found, instead, two provisions particularly important. First, "[s]ection 5 of the Act explicitly states that one of its purposes is that '[a]ll stalking victims should be able to seek a civil remedy requiring the offenders stay away from the victims and third parties.' " *Ivancicts*, 2017 IL App (4th) 170028, ¶ 22 (quoting 740 ILCS 21/5 (West 2016)). Second, "[s]ection 80(a) provides that '[i]f the court finds that the petitioner has been a victim of stalking, a stalking no contact order *shall* issue.' " (Emphasis in original.) *Ivancicts*, 2017 IL App (4th) 170028, ¶ 22 (quoting 740 ILCS 21/80(a) (West 2016)). Together, the statutory requirements that *all* stalking victims should receive a remedy against offenders and that trial courts *shall* issue protection orders when stalking is proven necessarily preclude trial courts from considering the petitioner's bad behavior. Indeed, we concluded: "The Act's goal of protecting all stalking victims would be thwarted if the

conduct of the alleged victim were a justification for denying protection." *Ivancicts*, 2017 IL App (4th) 170028, ¶ 24. We ultimately held "that the unclean-hands doctrine is unavailable as a defense to a petition for a stalking no contact order brought pursuant to the Act." *Ivancicts*, 2017 IL App (4th) 170028, ¶ 26.

¶ 26    The Gagliardos rely upon *Munoz*, where the Second District condoned the trial court's consideration of the unclean-hands defense in a matter brought under the Act, "namely that the petitioner's own misconduct precluded him from receiving a stalking no contact order." *Munoz*, 2014 IL App (2d) 130359-U, ¶ 73. The *Munoz* court based its conclusion on section 30 of the Act which provides, " 'a stalking no contact order shall be governed by the rules of civil procedure of this State.' " *Munoz*, 2014 IL App (2d) 130359-U, ¶ 68. Relying primarily on section 30, the court dismissed the petitioner's argument that the only defense to stalking can be found in section 10 of the Act, which defines "stalking" and "provides that '[s]talking does not include an exercise of the right to free speech or assembly that is otherwise lawful ***.' " *Munoz*, 2014 IL App (2d) 130359-U, ¶ 67. The Second District reasoned that since the Illinois Code of Civil Procedure allows for a respondent to "raise as many defenses as he has" and not just defenses based in the first amendment, then the Act must allow for the unclean-hands defense. *Munoz*, 2014 IL App (2d) 130359-U, ¶ 73.

¶ 27    We note, initially, that we are not bound by orders from our sister districts and are not required to follow or even defer to *Munoz. Sunbelt Rentals, Inc. v. Ehlers*, 394 Ill. App. 3d 421, 431-32, 915 N.E.2d 862, 870 (4th Dist. 2009), *overruled on other grounds by Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, 965 N.E.2d 393. To be sure, "the opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or

panels." *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440, 892 N.E.2d 994, 1006-07 (2008).

¶ 28        We see, next, that *Munoz* is an unreported order filed under Illinois Supreme Court Rule 23(b) and "is not precedential except to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case." Ill. S. Ct. R. 23(e) (eff. Jan. 1, 2021). However, Rule 23(e) provides that "a nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes." Ill. S. Ct. R. 23(e) (eff. Jan. 1, 2021). We note *Munoz* predates the January 1, 2021, threshold for eligibility to be cited even for persuasive purposes. But more importantly, we do not find *Munoz* persuasive whatsoever. We see flaws in the Second District's analysis, particularly its failure to even acknowledge sections 5 and 80(a) of the Act, which speak in mandatory terms that all victims should receive a remedy against their offenders and that trial courts shall issue protection orders when stalking is proven. Allowing the use of the unclean-hands defense, although allowed by the Illinois Code of Civil Procedure, would undermine these statutory mandates and undercut the Act's purpose "to protect all stalking victims, not just 'innocent' victims." *Ivancicts*, 2017 IL App (4th) 170028, ¶ 22. *Munoz* notwithstanding, under the Act, trial courts do not have discretion to deny a petitioner a protection order based on that person's unclean hands when the evidence shows the petitioner is a victim of stalking. See 740 ILCS 21/5, 80(a) (West 2020). Are there possibilities for abuse under this model, where the Act is used as a sword rather than a shield, as the Gagliardos contend? Yes. But hedging that risk is a task for the legislature, not the appellate court.

¶ 29        Since the Gagliardos offer no reasonable argument for us departing from *Ivancicts*, we remain steadfast in our prior interpretation of the Act and maintain our conclusion the unclean-hands defense does not apply in cases like these.

¶ 30   The Gagliardos next argue the trial court abused its discretion in issuing the stalking no contact order because it failed to "consider[ ] [their] testimony regarding the stalking behavior they suffered from [Ewing]." At first blush, this appears to be only a slight variation from the first argument, except cloaked in different language. If the unclean-hands doctrine is unavailable, the trial court cannot err in not considering the petitioner's bad behavior. Nevertheless, we indulge the argument the trial court erred in issuing the stalking no contact order given the evidence before it.

¶ 31   Though the Gagliardos phrase their argument in terms of "abuse of discretion," that is not our standard. "We will not reverse a trial court's decision to issue a stalking no contact order unless it is against the manifest weight of the evidence." *Piester v. Escobar*, 2015 IL App (3d) 140457, ¶ 12, 36 N.E.3d 344. "A decision is contrary to the manifest weight of the evidence when the opposite conclusion is apparent or when the decision is unreasonable, arbitrary, or not based on the evidence." *Enbridge Energy (Illinois), LLC v. Kuerth*, 2018 IL App (4th) 150519-B, ¶ 62, 99 N.E.3d 210.

¶ 32   "[W]e observe questions of witness credibility and conflicting evidence are matters for the trial judge to resolve as the trier of fact, and not this court." *McNally v. Bredermann*, 2015 IL App (1st) 134048, ¶ 14, 30 N.E.3d 557. "Because the trial court is in a superior position to determine witness credibility and to weigh evidence, we give great deference to the trial court's findings." *In re Todd K.*, 371 Ill. App. 3d 539, 543, 867 N.E.2d 1104, 1108 (2007); see also *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 70, 92 N.E.3d 1070 (" 'We give great deference to the trial court's credibility determinations, and we will not substitute our judgment for that of the trial court.' [Citation.]").

¶ 33        The Gagliardos contend "the trial court [erred] when weighing the facts and testimony in deciding that [Ewing] should be granted an order of protection." They argue Ewing provided "very little testimony" and "no concrete evidence" to prove her case while they offered "numerous hours of testimony from multiple witnesses and *** numerous exhibits showing" that Ewing harassed them. It is true Ewing presented just her testimony describing the Gagliardos' harassment along with five photographs. Ewing testified the Gagliardos were "constant[ly] cussing and yelling at me and my daughter." They would yell at Ewing's daughter, saying: "Your mother's a whore so that makes you a whore too and you need to go to hell." The Gagliardos banged on Ewing's door, and Trena followed Ewing on the way to work. Ewing presented photographs of the signs the Gagliardos placed in their yard calling her vulgar names and claiming she peeked in their windows. The trial court obviously found this evidence credible and, furthermore, it found it sufficient to show "that [Ewing] is a victim of two or more acts *** in violation of the statute and that it is appropriate for stalking no contact orders to be entered against both the [Gagliardos] in this particular proceeding." Specifically, Ewing's evidence proved the Gagliardos engaged in a course of conduct directed at the Ewings, which they knew or should have known would cause a reasonable person to fear for her safety or the safety of her child. As for the Gagliardos' contention the trial court totally disregarded all of their case, it is within the trial court's prerogative as the factfinder to do just that. *McNally*, 2015 IL App (1st) 134048, ¶ 14. We defer to these evidentiary and credibility determinations because the trial court observed the witnesses and evaluated the evidence firsthand. *Todd K.*, 371 Ill. App. 3d at 543. Since the trial court's decision to issue the plenary stalking no contact order is reasonable, supported by the evidence, and not arbitrary, we cannot conclude it stands against the manifest weight of the evidence. *Kuerth*, 2018 IL App (4th) 150519-B, ¶ 62.

¶ 34                                    III. CONCLUSION

¶ 35        For the reasons stated, we affirm the trial court's judgment.

¶ 36        Affirmed.